## STATE OF CONNECTICUT *v.* CHARLES F. O'NEILL
(11990)

PETERS, C. J., HEALEY, SHEA, SANTANIELLO and CALLAHAN, Js.

Argued March 12—decision released June 24, 1986

---

[4] Because of our disposition of the plaintiff's first claim of error, we do not reach the three remaining issues.

*Francis T. Mandanici,* with whom, on the brief, was *Timothy C. Moynahan,* for the appellant (defendant).

*F. Patrick O'Sullivan,* special assistant state's attorney, with whom, on the brief, was *John A. Connelly,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury, the defendant Charles F. O'Neill was found guilty of the crime of arson in the first degree in violation of General Statutes § 53a-111 (a) (1).[1] This appeal followed.

On appeal, the defendant claims that the trial court erred: (1) in admitting "prejudicial evidence concerning unsubstantiated allegations" of prior bad acts by him and in other evidentiary rulings concerning that evidence;[2] (2) in failing to instruct the jury as requested on lesser included offenses; (3) in giving a "Chip Smith" instruction (*State* v. *Smith,* 49 Conn. 376 [1881]); and (4) in imposing, pursuant to a statutory scheme involving mandatory sentences, an unconstitutional sentence which was not proportional to the crime and which vio-

---

[1] General Statutes § 53a-111 (a) (1) provides in relevant part: "ARSON IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

[2] At oral argument, the defendant's counsel stated that he was withdrawing a claim of prosecutorial misconduct in the state's closing argument as a distinct assignment of error, but that he was, nevertheless, going to use the claimed misconduct in the argument to show prejudice insofar as that argument contravened the basis upon which the court had admitted the prior acts of claimed misconduct.

lated his constitutional right to the equal protection of the laws.[3]

The jury could reasonably have found the following facts: On Sunday morning, February 21, 1982, at 1:20 a.m., a Waterbury police officer was dispatched by car radio to a fire at a house owned by the victim, a former girlfriend of the defendant, located at 51 Edgewood Avenue in Waterbury. Upon his arrival, he observed not only that smoke and steam were coming from the front of the house, but that the fire had been put out by the victim's son, Steven, with a garden hose. He observed fire damage to the front porch and the aluminum siding. He smelled what he believed to be gasoline, the aroma of which got stronger as he walked nearer to the house. As a result of his investigation in the area, he came upon a truck about 100 yards up Edgewood Avenue on a corner. Under the truck he found a plastic container which had some fluid in it that smelled of gasoline. This truck was later identified to be owned and used by the defendant in his business of servicing and handling fire extinguishers for customers such as factories, shops, stores, schools and convalescent homes.

The defendant testified concerning his background in this area. Much of his time in his four years in the United States Air Force was spent in the fire prevention field. Prior to establishing his own business, he had spent time in Kansas where he sold, serviced and installed fire equipment and later did similar work for approximately five years for a fire equipment company in Las Vegas. He has attended seminars and given demonstrations involving fire.

---

[3] At oral argument, the defendant was given permission to file an amended statement of issues so as to incorporate in this claim of error the principles of our recent decision in *State* v. *Jenkins,* 198 Conn. 671, 504 A.2d 1053 (1986). The defendant has done so and has also filed a memorandum setting out his claims as to the applicability of *Jenkins*.

At the time of the fire, the victim, her son Steven, her daughter Lori and two other persons were on the second floor of 51 Edgewood Avenue, and a tenant was on the first floor. Lori, who was sleeping on a living room couch, awakened upon hearing a "loud boom," saw a bright light and "orange flames" and yelled that there was a fire. Steven then went down, hooked up a garden hose and put out the fire in "a matter of minutes." The fire department and additional police came to the scene. Captain Nicholas Russo, the Waterbury deputy fire marshal, noted a "strong smell of gasoline vapors" at the scene. In his opinion, the fire started on the front porch by the use of an accelerant and "human hands [had] set the fire." A detective at the scene smelled what appeared to be gasoline in the front area of the house.

The defendant and the victim had dated intermittently from about October, 1980, to October 10, 1981, at which time their relationship ended. The relationship had been a stormy one, yet the defendant professed his love for her and had asked her to marry him. She refused, and after their October 10, 1981[4] dispute, she never saw the defendant again.

The trial court admitted evidence of several acts of alleged vandalism against the victim or her family that had occurred before October 10, 1981. These acts allegedly occurred when the victim and the defendant had had disagreements at various times during the course of their relationship. The acts involved were that two electric meters were taken from her home around Easter of 1981, paint was thrown onto the car of her teenage son, Chris, around July 4, 1981, and air was let out of two of the tires on Chris' car around Labor Day, 1981.

[4] The evidence was conflicting, inter alia, concerning whether it was the victim or the defendant who decided to end their relationship on October 10, 1981.

The victim maintained that she and the defendant had had disagreements concerning Chris, that the defendant was jealous of the affection she showed for her son and that she did not show the defendant any affection, nor did she love him. She testified that after Labor Day, 1981, upon asking him if he did these things: "[i]n a joking way, he said, 'yes, I did,' and he started to laugh." The evidence was conflicting on whether the defendant "admitted" these acts as well as whether the defendant had ever told her that "he never gets mad, but [that he] just gets even."

I

We turn first to the defendant's claim concerning the alleged acts of prior misconduct. The trial court told the jury that it was admitting this evidence for the purpose of motive and identity. The defendant claims that the trial court initially erred in admitting this evidence without first determining by clear and convincing evidence that he had committed these acts. This evidence was, he argues, highly prejudicial because the prosecutor used it to convey to the jury that he had a bad character, the propensity to commit vandalistic acts "such as the said fire" and that he was the type of person to retaliate. He argues that such use of acts of prior misconduct is "clearly forbidden." He maintains that his main defense, the lack of the intent required for the crime charged, was clearly harmed by the admission and use of such evidence. This is true, he asserts, because if the jury were to have found that he did commit these prior acts, it would be more likely to consider the fire as part of a consistent, intentional and premeditated scheme to harass the victim and her family rather than as an uncontrolled, unintentional, spontaneous act done by him while he was on an alcoholic "binge." The harmfulness of this evidence was compounded, the defendant continues, by other evidentiary rulings. The first is that he was prohibited from rebutting prior mis-

conduct evidence by testimony from a defense witness about a claimed inconsistency in the victim's testimony about who vandalized her electric meters. He also claims error in the court allowing the state during its cross-examination of the defendant to ask whether anyone, including the police, had ever questioned him or accused him of this prior vandalism.

As already noted, the trial court admitted the prior acts for the limited purposes of their consideration by the jury on the questions of motive and identity. In addition, whether the defendant had acknowledged committing these acts was a question properly left to the jury. " 'As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399 [1960].' *State* v. *Fredericks,* 149 Conn. 121, 124, 176 A.2d 581 (1961); McCormick, Evidence (2d Ed. 1972) § 190; 1 Wharton, Criminal Evidence (13th Ed.) § 170. The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. See *State* v. *Williams,* 190 Conn. 104, 108, 459 A.2d 510 (1983); *State* v. *Howard,* 187 Conn. 681, 684, 447 A.2d 1167 (1982); *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Barlow,* 177 Conn. 391, 393, 418 A.2d 46 (1979); 1 Wigmore, Evidence (3d Ed.) §§ 215–18. Evidence of other misconduct, however, 'may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity'; *State* v. *Ibraimov,* supra; or an element of the crime. *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982)." *State* v. *Braman,* 191 Conn. 670, 675–76, 469 A.2d 760 (1983); *State* v. *Ryan,* 182 Conn. 335, 337, 438 A.2d 107 (1980). Despite its prejudicial character, evidence of such misconduct may be admissible if the prior acts

are relevant and material to such matters as motive and identity; *State* v. *Johnson,* 190 Conn. 541, 548, 461 A.2d 981 (1983); and the trial judge determines, in his judicial discretion, that the probative value outweighs the prejudicial tendency. *State* v. *Asherman,* 193 Conn. 695, 728, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Johnson,* supra; *State* v. *Barlow,* 177 Conn. 391, 394, 418 A.2d 46 (1979). "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." *State* v. *Johnson,* supra, 548–49; *State* v. *Turcio,* 178 Conn. 116, 129, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980). On our review, therefore, "every reasonable presumption should be given in favor of the trial court's ruling." *State* v. *Ryan,* supra, 339; *State* v. *Barlow,* supra, 394.

The trial court admitted this evidence after a full hearing in the absence of the jury. At that time, the victim was examined at length by the state and not at all by the defense. The court recognized that the state's claim here encompassed, inter alia, that the defendant struck out against the victim in return for her treatment of him over the stormy course of their association. It perceived the relevance of this evidence on motive and identity. There is no question that motive may be probative of the identity of a perpetrator. See, e.g., *State* v. *Green,* 232 Kan. 116, 121, 652 P.2d 697 (1983); McCormick, Evidence (3d Ed. 1984) § 190, p. 562. It is true that the court did not state, as the defendant claims it should have, that, in admitting that evidence, it had first determined "by clear and convincing evidence that the defendant committed the acts." The short answer to that is that it was not required to do so with reference to this evidence nor does the defend-

ant refer us to any Connecticut law that so mandates.[5] A fair reading of the transcript does disclose that the court performed the weighing process and, in doing so, excluded other prior misconduct evidence. In addition, it properly left the question of their commission and consequent weight for the jury to determine.

There is no merit to the defendant's claim that the prosecutor used this evidence to convey to the jury that the defendant had a bad character and a propensity to commit vandalistic acts such as the fire in question and that he was a person to retaliate. The defendant specifically points to certain language used by the prosecutor in his closing argument to the jury such as: "[The defendant was] the scorned lover, scorned boyfriend [who] finally acted on his statement that he didn't get mad, he got even . . . ." The defendant did not object to this argument at trial nor did he request curative instructions. "We have held on a number of occasions that where a criminal defendant does not object and take exception to allegedly prejudicial remarks of the state's attorney, either at the time they were made or at the close of argument, he waives his right to press the claimed error on appeal." *State* v. *Tyler-Barcomb*, 197 Conn. 666, 673, 500 A.2d 1324 (1985).

Likewise, we reject the defendant's argument that the admission and use of the prior misconduct evidence so undermined his "main defense" of the lack of the requisite mens rea due to his intoxication that even if he had started the fire while on a "binge" as an unintentional, uncontrolled and spontaneous act, the evi-

---

[5] On this nonconstitutional evidentiary claim, the defendant refers to *State* v. *Guthridge*, 164 Conn. 145, 156, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973), for support. That case is clearly inapposite. In *Guthridge*, we said that the state satisfied its burden of showing by clear and convincing evidence that an in-court identification was independent of a prior one-on-one showing of the defendant that was claimed to be fundamentally unfair. That is hardly this case.

dence might have encouraged a wavering jury to find that starting the fire was a "premeditated act of retaliation." There was no doubt that credibility, particularly that of the defendant, was crucial. See *State* v. *Carter,* 189 Conn. 631, 640, 458 A.2d 379 (1983). There was a plethora of evidence from him of an amazing recall of the events of Saturday, February 20, 1982, to the approximate time of the fire early the next morning at 1:20 a.m. This recall included all the places he had been, including some seven cafes and restaurants, the order in which he had visited them, the time he had spent there and what and how many alcoholic beverages he had had at each. He also recalled a number of the persons he had seen, and where and when he had seen them. He testified as to routes taken that day both when he had been driving his truck and while walking. He said that he had still been driving his truck at about 11 p.m. on Saturday night which was after he had been to five cafes or restaurants where he had consumed about fourteen or fifteen mixed drinks in addition to one or two glasses of wine and three or four drinks of Sambucca with coffee. After 11:30 p.m., he said he had had two more drinks while looking for his truck. It was while he had been walking home that the police apprehended him about 2:15 a.m. Interestingly, several police officers observed him shortly after that time. One said he had "possibly" been drinking or under the influence of liquor, another did not remember smelling alcohol on the defendant and another noticed a "slight trace of alcohol on his breath," but he would not say that the defendant had been intoxicated. We refer to such evidence to demonstrate the fact-bound context of this case replete with questions of credibility which are so uniquely proper for the trier of fact. The jury had the testimony of twenty-five witnesses to assess and the issue of intoxication which bears on the existence of the requisite intent permeated not only the defendant's

but the state's claim on intent. The trial court carefully instructed, without exception, on intoxication as well as its relation to the element of intent. We have already held that the prior misconduct testimony was properly admitted and that it was not improperly used by the state. The present claim, shorn of its assertions, must fail.

As a subissue of his overall argument on the admission and use of the prior misconduct evidence, the defendant also claims error in two evidentiary rulings. First, he claims error in the exclusion of testimony of Eleanor McNamara, a defense witness, who allegedly would have testified that the victim had made statements to her concerning the vandalizing of her electric meters that were inconsistent with the victim's testimony at the trial. We cannot conclude that the trial court erred in the exercise of its discretion in excluding this extrinsic evidence. See *State* v. *Crane,* 169 Conn. 242, 245, 362 A.2d 843 (1975); *State* v. *Wilson,* 158 Conn. 321, 324, 260 A.2d 571 (1969); McCormick, Evidence (3d Ed. 1984) § 36; 81 Am. Jur. 2d, Witnesses §§ 474-76.

Error is also claimed because the trial court allowed the state, over objection, to cross-examine the defendant as to whether anyone, including the police, had ever questioned him concerning the prior acts of vandalism or whether he was responsible for them. The defendant's counsel objected, saying that there had been nothing on his direct examination about that, that it was "totally irrelevant," that it created a "side issue" and was not material. The ruling was not error because the transcript discloses that defense counsel had explored this matter on his direct examination.

## II

The defendant also claims that the trial court erred in failing to instruct the jury, as requested, on the lesser

included offenses of arson in the third degree, General Statutes § 53a-113,[6] and reckless burning, General Statutes § 53a-114.[7] We do not agree. "A defendant is entitled to an instruction on a lesser offense if, and only if, the following conditions are met: (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) the evidence, introduced by either the state or the defendant, or by a combination of their proofs, justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant not guilty of the greater offense but guilty of the lesser." *State* v. *Smith,* 185 Conn. 63, 76–77, 441 A.2d 84 (1981); see *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980). At oral argument, the state conceded that the first three prongs of *Smith* had been met but maintained that the fourth had not. At oral argument, the defendant, sensing the fragility of his claim, said that in making this claim he was asking this court essentially to make a major modification of our lesser included offense rule. While he recognizes that, given the substitute information,[8] the evidence

[6] General Statutes § 53a-113 provides in part: "(a) A person is guilty of arson in the third degree if he recklessly causes destruction or damage to a building, as defined in section 53a-100, of his own or of another by intentionally starting a fire or causing an explosion."

[7] General Statutes § 53a-114 provides in part: "(a) A person is guilty of reckless burning if he intentionally starts a fire or causes an explosion, whether on his own property or another's, and thereby recklessly places a building, as defined in section 53a-100, of another in danger of destruction or damage."

[8] The substitute information was the following:

"Paul E. Murray, Assistant State's Attorney for the Judicial District of Waterbury accuses CHARLES F. O'NEILL, 1417 E. Main Street, Waterbury, Ct. of ARSON in the First Degree and charges that at the Town or City of Waterbury on or about the 21st day of February, 1982, at approxi-

in this case was not "sufficiently in dispute" to satisfy the fourth prong of *Smith*, he, nevertheless, argues that the unique circumstances of this case require that we modify our lesser included offense rule as set out in *Smith*. He claims that the state wrongfully "edit[ed]" the charge by not charging him with that portion of § 53a-111 (a) (1) which would require the state to prove that the defendant "[had] reason to believe the building may be inhabited or occupied," but rather charged him with that portion that required the state to prove only that "the building [was] inhabited or occupied." This "editing" not only effectively blocked a lesser offense instruction, according to the defendant, but also enabled the state "to pick and edit" the charge in a manner such that at sentencing it "tied the court's hands" because a conviction under the charge selected by the prosecutor required the imposition of a mandatory non-suspendible minimum sentence. See General Statutes §§ 53a-29, 53a-35a. Had the state charged only that portion of § 53a-111 (a) (1) which required that it prove that the defendant "[had] reason to believe the building may be inhabited or occupied," then, he argues, because of his claimed intoxication with its effect on the specific intent required, a lesser included offense charge would have been mandated because then the fourth prong of *Smith* would be met.

Not only do we decline to modify our lesser included offense rule as urged by the defendant, but we reject his "editing" claim.[9] "We have always held that prose-

mately 1:20 A.M. at 51 Edgewood Avenue the said CHARLES O'NEILL did, with intent to damage and destroy a building, start a Fire, and at that time the said building was inhabited and occupied, in violation of Section 53a-111 (a) (1) of the General Statutes."

[9] Our rejection of the defendant's "editing" claims makes unnecessary any extended discussion of the defendant's claim that either arson in the third degree in violation of General Statutes § 53a-113 or reckless burning in violation of General Statutes § 53a-114 are lesser included offenses of arson in the first degree in this case. In any event, arson in the third degree

cutors have broad discretion in determining what crime or crimes to charge in any particular situation. *State* v. *Villafane,* 171 Conn. 644, 664, 372 A.2d 82 [(1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977)]; *State* v. *Townsend,* 167 Conn. 539, 554, 356 A.2d 125 [cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975)]." *State* v. *Chetcuti,* 173 Conn. 165, 168, 377 A.2d 263 (1977); *State* v. *McKenna,* 188 Conn. 671, 680, 453 A.2d 435 (1982). The state has "considerable latitude as to how and in what manner it shall proceed against an accused." *State* v. *Zeko,* 176 Conn. 421, 423, 407 A.2d 1022 (1979). The discretionary power of the state to select an appropriate charge is, of course, "limited in the usual and lawful manner by the facts the prosecutor may be reasonably expected to prove at trial." *State* v. *Darden,* 171 Conn. 677, 682, 372 A.2d 99 (1976); *People* v. *Eboli,* 34 N.Y.2d 281, 313 N.E.2d 746, 357 N.Y.S.2d 435 (1974). The decision of the state here was a proper exercise of its discretion as the statute provided a choice between options as evidenced by the clearly disjunctive language used by the legislature in § 53a-111 (a) (1). The rationale of such cases as *Hutcherson* v. *United States,* 345 F.2d 964 (D.C. Cir.), cert. denied, 382 U.S. 894, 86 S. Ct. 188, 15 L. Ed. 2d 151 (1965), is applicable. See also *People* v. *Eboli,* supra. *Hutcherson* pointed out that it was not a denial of due process where the prosecution proceeded under one of two applicable statutes, stating: "A defendant has no constitutional right to elect which of

would not be a lesser included offense in this case because it requires an element, i.e., the intentional starting of a fire or causing an explosion, not required for arson in the first degree. See *State* v. *Whistnant,* 179 Conn. 576, 584, 427 A.2d 414 (1980). Likewise, reckless burning is not a lesser included offense as it too requires an element, i.e., the intentional starting of a fire or explosion, not required by arson in the first degree. Id. The intent required for arson in the first degree, i.e., "to destroy or damage a building" is, on the other hand, the intent to effect a result different from the result or effect which is required by the "intentional" conduct in either arson in the third degree or reckless burning.

two applicable statutes shall be the basis of his indictment and prosecution." *Hutcherson* v. *United States,* supra, 967. It is also significant that the defendant in this case expressly makes no claim of prosecutorial misconduct as a component of his "editing" claim.

### III

Next, the defendant claims that the trial court erred in giving the "Chip Smith" charge under the special circumstances of this case. The key circumstance the defendant advances here is that it was given, not only on the third day of deliberations but in a case where a lesser included instruction was erroneously refused, thus greatly weakening his crucial factual claims concerning the effect of his intoxication. Here he argues that the "only real factual issue" in the case involved his intoxication. Given, as it was, on the third day of deliberations, it was coercive and undermined the position of the conscientious dissenting juror.[10] The result of these circumstances, he asserts, violated his right to due process and a fair trial under both the United States and the Connecticut constitutions. The defendant objected before the trial court gave this instruction, and his motion for a mistrial after it was given was denied. The trial court did not err as claimed.

"The 'Chip Smith' charge has been so consistently upheld by this court that the defendant does not challenge it directly. See *State* v. *Stankowski,* 184 Conn. 121, 145–46, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981), and cases cited therein." *State* v. *Avcollie,* 188 Conn. 626, 641, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Jones,* 193 Conn. 70,

---

[10] In his brief and in oral argument before us, the defendant's counsel referred to the dissenting juror. At oral argument, he acknowledged that the record does not support any claim that there was one dissenting juror when the "Chip Smith" charge was given.

91–92, 475 A.2d 1087 (1984). Rather, he claims that the "special circumstances" of this case rendered the instruction harmful error.[11] We do not agree.

The jury wrote a note to the trial court, signed by its foreperson, which simply said: "The jury cannot reach a unanimous verdict." There was no indication then or thereafter of the nature or number of the division of the jury. See *Brasfield* v. *United States*, 272 U.S. 448, 47 S. Ct. 135, 71 L. Ed. 345 (1926). Initially, we point out that the trial judge clearly and articulately instructed the jury just prior to the "Chip Smith" charge[12] that the charge was not to be construed as

---

[11] The defendant, referring to *State* v. *Peary*, 176 Conn. 170, 183, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2417, 60 L. Ed. 2d 1072 (1979), argues that a "fundamental right" is involved when an issue is raised concerning a coercive jury instruction. Alleging that giving the challenged instruction violated both the United States and Connecticut constitutions, he claims that the burden is on the state to prove the alleged violation harmless beyond a reasonable doubt. *Peary* is not authority for moving the burden to the state. *Peary* involved the "Chip Smith" charge, to which the objection on appeal was not made at trial. Id. Despite a failure to object, in *Peary* we considered the objection "because a fundamental right is involved and review may be made on the record" and for that proposition cited two cases, i.e., *State* v. *Evans*, 165 Conn. 61, 69, 327 A.2d 576 (1973), and a post-*Evans* case which in turn relied on *Evans* for the issue reviewed. See *State* v. *Chesney*, 166 Conn. 630, 639, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974).

[12] Immediately prior to the "Chip Smith" charge, the trial court charged the jury as follows:

"[T]he court feels that this matter has been well tried and you have heard the evidence in the matter and although this is not three complete days, but this is the third day of deliberations, that the court is of the opinion that it should give you additional instructions regarding this matter, to see whether or not it is within your reach to arrive at a verdict in this matter.

"So, with this thought in mind, the court wishes to state to you, at the outset, that the additional instructions are not to be construed by you as to be coercive in any manner or to compel you to arrive at a verdict, the instructions are designed to aid you in considering your own positions, individually and weighing your individual positions against the collective positions or the positions of other members of the jury and after having

"coercive in any manner," that it was "designed to aid" the jury and that the instructions were not "to suggest . . . in any manner, that you are compelled to reach a verdict or must reach a verdict." Rather, the jury was told that the charge it was about to give was "to see whether or not it is within your reach to arrive at a verdict in this matter." It was right after these patently fair threshold instructions that the "Chip Smith" charge itself was given.[13]

The charge itself was not at all coercive or prejudicial as claimed. "While a defendant is not entitled to an instruction that a jury may 'hang' . . . he is entitled

---

done so, to reconsider whatever conclusions that you individually may have reached, not to suggest to you, in any manner, that you are compelled to reach a verdict or must reach a verdict.

"The court's instructions that I shall give you now is only to provide you with additional information so that you may return to your deliberations and see whether or not you can arrive at a verdict."

[13] The "Chip Smith" instruction given was the following:

"Along these lines, the court would like to state the following to you: although the verdict to which each of you agrees must express his or her own conclusion and not a mere acquiescence in the conclusion of your fellow jurors, yet in order to bring your six minds to a unanimous result, you should consider the questions you have to decide, not only carefully, but also with due regard and deference to the opinions of each other.

"In conferring together, you ought to pay proper respect to each other's opinion and listen with an open mind to each other's argument. If much the larger number of you reach a certain conclusion, a dissenting juror or jurors should consider whether his opinion or her opinion is a reasonable one, when the evidence does not lend to a similar result in the minds of so many of you who are equally honest and equally intelligent with yourself, who have heard the same evidence with the same attention, with equal desire to arrive at the truth and under the same sanctions of the same oath. If the majority of you are for one decision, the minority ought seriously to ask themselves whether they may not reasonably or ought not to doubt their own conclusions when it is not concurred in by most of those with whom they are associated and they may well distrust the weight or sufficiency of the evidence upon which they rely when it fails to bring the minds of their fellow jurors to the same conclusions that you hold.

"I have stated this to you in order to get you to further consider in your deliberations the opinions of your fellow jurors. This is all.

"I am going to ask you to return to the jury room and see if you can arrive at a verdict. All right. You may return to the jury room."

to a jury unfettered by an order to decide." (Citations omitted.) *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147 (1974); *State* v. *Peary,* 176 Conn. 170, 184, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2417, 60 L. Ed. 2d 1072 (1979). The instruction falls squarely within that principle. There was no direction to decide; it was told "[to] see if you can arrive at a verdict." While the claim that the "Chip Smith" charge undermined the position of *the* conscientious dissenting juror has no factual basis, the trial court referred "to a dissenting juror or jurors" in its even-handed instruction. It did not direct a verdict, and, while arguably encouraging one; see *State* v. *Avcollie,* supra, 647; it made clear that whether they arrived at a verdict was entirely up to them. The potential of a mistrial, upon a deadlock, often regarded as coercive, was fully absent in this charge. See, e.g., *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 100 n.16, 300 N.E.2d 192 (1973). Because the possibility of disagreement by a jury and the consequent lack of a unanimous verdict "is a protection conferred upon a criminal defendant in a criminal case by the [United States] constitution," for a judge to tell a jury that a case must be decided is not only coercive in nature but is also misleading in fact because to do so precludes the right of a defendant to rely on the possibility of a disagreement by the jury. *United States* v. *Harris,* 391 F.2d 348, 355 (6th Cir.), cert. denied, 393 U.S. 874, 89 S. Ct. 169, 21 L. Ed. 2d 145 (1968).

The "Chip Smith" instruction was timely given, and it accurately set out the jurors' duty and, even without the instructions immediately preceding it, was not erroneous as argued in the "special circumstances" of this case. There was no constitutional violation of the defendant's rights as claimed.

## IV

Finally, the defendant claims that because of an alleged unconstitutional statutory scheme involving mandatory minimum sentences, the trial court imposed a sentence which was unconstitutional because it was not proportional to the crime. Invoking both the United States and Connecticut constitutions, he asserts that the sentence imposed was unconstitutional because it violated his rights to equal protection of the laws, due process and against cruel and unusual punishment.[14]

Certain background circumstances are necessary to put this equal protection claim in context. At the time of sentencing in 1982, the defendant argued that the requirement that arson in the first degree required a mandatory nonsuspendible minimum sentence of ten years rendered the sentencing scheme unconstitutional. Although he urged the trial court to impose a sentence of ten years suspended after five, the trial court refused to do so indicating that, in its view, the statutory scheme afforded it no discretion but to impose the mandatory nonsuspendible minimum sentence of ten years, which it did.[15] See General Statutes §§ 53a-111, 53a-35a (3). Sometime later, in June, 1985, the defendant filed a motion to reduce his sentence and at the hearing on that motion, the defendant's counsel cited our recently published decision in *State* v. *Dupree,* 196 Conn. 655, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985), which held that the trial court had properly suspended a portion of a

[14] Because we dispose of this claim on equal protection grounds, we need not discuss the tenuous branch of this claim that asserts that the sentence imposed constituted cruel and unusual punishment; see *Solem* v. *Helm,* 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983); nor need we discuss the defendant's due process claim.

[15] At that time, the trial court indicated that, were the mandatory non-suspendible minimum sentence not required, it did not know what sentence it would impose upon the defendant.

sentence for arson murder. He argued that, therefore, a sentence for arson in the first degree could be suspended. The trial court refused to grant the motion, indicating that *Dupree* did not apply because that case involved an unclassified felony as opposed to the "classified" felony in this case, as well as saying that it would not interfere with the penalty that the legislature has prescribed.

About three weeks prior to oral argument in this case, we handed down our decision in *State* v. *Jenkins,* 198 Conn. 671, 504 A.2d 1053 (1986). In *Jenkins,* the defendant had been convicted of kidnapping in the first degree *without a firearm,* General Statutes § 53a-92 (a) (2) (C). At his sentencing, Jenkins asked the trial court to consider suspending part of the ten year minimum sentence prescribed for his conviction under General Statutes § 53a-92. *State* v. *Jenkins,* supra, 673. The defendant acknowledged that General Statutes §§ 53a-92, 53a-28 and 53a-29 prohibited suspension of sentences for Class A felonies. Asking the trial court to read these statutes together with General Statutes § 53a-92a, governing kidnapping in the first degree *with a firearm,* he maintained that, because § 53a-92a permits suspension of the sentence after one year, an ambiguity existed between the statutes. The defendant's counsel, therefore, asked that the court consider suspending Jenkins' sentence after seven years. *State* v. *Jenkins,* supra. While agreeing with the defendant that there was some ambiguity between the relevant statutes, we found the record clear that the trial court felt constrained to impose a mandatory sentence and that it could not suspend any portion of it. In *Jenkins,* unlike this case, we had to "deal with legislative error that mistakenly assigns a lesser penalty to a greater crime." Id., 677. A literal reading of the statutes in that case persuaded us that Jenkins was required to be given a mandatory minimum sentence that

exceeded by nine years the mandatory minimum sentence that would be given a person convicted of kidnapping in the first degree *with a firearm*—a crime obviously more serious than that of which Jenkins had been convicted. We therefore concluded that "[s]uch a discrepancy necessarily implicates the equal protection clauses of our federal and state constitutions." Id.

Conscious of the legislative prerogative and the desire to avoid a constitutional confrontation, as well as recognizing that Jenkins' sentence needed further review, we acknowledged that "[t]he legislature, cognizant of the constitutional guarantees of equal protection, must be deemed to have sought to attain a rational and sensible result that avoids placing a statute in constitutional jeopardy." Id., 679. Applying that theorem in *Jenkins,* we stated: "It is not rational and sensible to impose a lesser term of mandatory imprisonment on one convicted of kidnapping *with the use of a firearm* than on one convicted for a similar crime *not* involving a firearm." (Emphasis added.) Id., 679–80.[16] There, we found error in the trial court's refusal to exercise the discretion conferred on it by § 53a-92a (b) to consider suspension of Jenkins' sentence of imprisonment after one year.

The defendant claims that *Jenkins* is dispositive of this issue in this case. We agree. At oral argument, the state conceded that *Jenkins* applied and that it could not distinguish it "morally or legally." In conceding

[16] To avoid the "constitutional quagmire" that would otherwise face us in *Jenkins,* we held that General Statutes § 53a-92a (b) had "created an irreconcilable conflict in the statutes governing mandatory minimum sentences for kidnapping in the first degree" and we were careful to state that we also held that "until the legislature takes corrective action, the sentencing provision of § 53a-92a (b) governs all prosecutions for kidnapping in the first degree." *State* v. *Jenkins,* 198 Conn. 671, 680, 504 A.2d 1053 (1986). We held, accordingly, that the trial court erred "in refusing to exercise the discretion conferred upon it by § 53a-92a (b) to consider suspension of the defendant's sentence of imprisonment after one year." Id.

this as to the sentencing phase, the state agreed that that meant that we should remand this case to the trial court for it to determine whether it would consider a suspension of the defendant's sentence of imprisonment. This is so because we regard the rationale of *Jenkins* as persuasive in this case on the equal protection ground.

We point out that, as in *Dupree,* the classification of crimes is for the legislature. *State* v. *Dupree,* supra, 665; *State* v. *Rao,* 171 Conn. 600, 603, 370 A.2d 1310 (1976); *State* v. *Robbins,* 257 N.W.2d 63, 67 (Iowa 1977). It is the general rule that while the legislature has wide power to prescribe the nature, character and extent of defined offenses, its power to fix penalties is, however, subject to constitutional proscription. *People* v. *Bradley,* 79 Ill. 2d 410, 417, 403 N.E.2d 1029 (1980); *People* v. *Dixon,* 400 Ill. 449, 453, 81 N.E.2d 257 (1948); *Commonwealth* v. *Jackson,* 369 Mass. 904, 909, 344 N.E.2d 166 (1976); *State* v. *Moore,* 286 N.W.2d 274, 278 (N.D. 1979), cert. denied, 446 U.S. 943, 100 S. Ct. 2170, 64 L. Ed. 2d 799 (1980); *State ex rel. Cogar* v. *Kidd,* 160 W. Va. 331, 371, 376, 234 S.E.2d 899 (1977); see *Louisiana ex rel. Francis* v. *Resweber,* 329 U.S. 459, 469, 67 S. Ct. 374, 91 L. Ed. 422 (1947). Whether a penalty is proportional to a certain offense is a legislative question which courts cannot change unless that legislative determination is unconstitutional. *Clifton* v. *State,* 176 Ind. App. 395, 397, 375 N.E.2d 1126 (1978). The legislature is entitled to establish more severe penalties for acts which it believes have greater impact and graver consequences. *Sheriff, Clark County* v. *Williams,* 96 Nev. 22, 24, 604 P.2d 800 (1980).

We know that it is not the prerogative of courts in this area lightly to "launch an inquiry to resolve a debate which has already been settled in the legislative forum." *Commonwealth* v. *Leis,* 355 Mass. 189, 202, 243 N.E.2d 898 (1969) (Kirk, J., concurring). It

is clear, however, as the United States Supreme Court has said in *Weems* v. *United States,* 217 U.S. 349, 367, 30 S. Ct. 544, 54 L. Ed 793 (1910), that it is "a precept of justice that punishment for crime should be graduated and proportioned to the offense." In *Jenkins,* we determined that the "effect of the enactment of § 53a-92a [was] to link a more serious crime with a less serious penalty." *State* v. *Jenkins,* supra, 676. While the background circumstances in *Jenkins* are not those in this case, the equal protection constitutional guidelines and the ultimate effect are the same. Arson murder requires a greater degree of culpability and criminality than first degree arson because arson murder involves both arson and a death. On the other hand, arson in the first degree requires a lesser degree of culpability and criminality. Although different statutes were involved in *Jenkins,* there is a compelling constitutional parallel between that case and this which persuades us that this defendant's equal protection rights have been violated. Here, this defendant who acted with the less culpable intent and who caused a less serious result than a defendant who commits arson murder should not receive the greater penalty—a mandatory nonsuspendible ten year minimum term. The constitutional infirmity violates his equal protection rights. The trial court was in error in refusing to exercise its discretion to consider any suspension of the defendant's sentence of imprisonment.

There is error, the judgment is set aside and the case is remanded only for resentencing in accordance with this opinion.

In this opinion the other justices concurred.