STATE OF CONNECTICUT *v.* ANDREA JACKSON
(AC 18439)

Landau, Mihalakos and Spallone, Js.

Argued November 1, 1999—officially released January 4, 2000

*Francis A. Miniter*, with whom were *Brian D. Smith* and, on the brief, *Daniel S. Fabricant*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Mark S. Solak*, state's

attorney, and *Debra Hughes*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

SPALLONE, J. The defendant, Andrea Jackson, appeals from the judgment of conviction, following a jury trial, of the crime of stalking in the third degree in violation of General Statutes § 53a-181e. On appeal, the defendant claims that the trial court improperly (1) failed to determine that General Statutes §§ 53a-181d[1] and 53a-181e[2] are unconstitutionally vague and overbroad on their face and as applied to the defendant's conduct, (2) failed to determine that there was insufficient evidence to support the defendant's conviction for the offense of stalking in the third degree, (3) gave a "Chip Smith" charge when it instructed the jury on the elements of stalking in the third degree, (4) failed to instruct the jury adequately as to the element of the crime requiring that the defendant's actions be repeated and (5) failed to determine that the prosecutor committed prejudicial misconduct during the state's closing argument. We affirm the judgment of the trial court.

The defendant was charged in three separate informations with four counts of stalking in the second degree. The jury returned verdicts of not guilty of those charges and a verdict of guilty of the lesser included offense of stalking in the third degree on one information.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts.

---

[1] General Statutes § 53a-181d (a) provides: "A person is guilty of stalking in the second degree when, with intent to cause another person to fear for his physical safety, he wilfully and repeatedly follows or lies in wait for such other person and causes such other person to reasonably fear for his physical safety."

[2] General Statutes § 53a-181e (a) provides: "A person is guilty of stalking in the third degree when he recklessly causes another person to reasonably fear for his physical safety by wilfully and repeatedly following or lying in wait for such other person."

In 1996, Richard Warner, the victim, was employed as an anesthesiologist at Day Kimball Hospital in Putnam. The victim was married and had two children. The defendant was one of his patients at the hospital, who suffered from chronic Lyme disease, and the victim provided the defendant with pain management treatment. The victim considered his relationship with the defendant to be, at all times, professional and that of physician-patient.

Nonetheless, certain instances caused the victim to feel uncomfortable when he was around the defendant. The defendant began to call the victim "Rich" or "Richard" rather than "Dr. Warner" or simply "doctor," as did all of his other patients. On one occasion, the victim discovered that a rose had been put on his wife's car when he arrived to watch his son's karate lessons. His concern was heightened approximately one week later when roses were delivered to him at the hospital with an unsigned card that had a "smiling face" and simply stated, "guess who?"[3]

At about the same time, the victim began to receive strange telephone calls at his office. For example, when the telephone rang and the victim picked up the receiver, he would hear the sound of a "raspberry"[4] followed by the telephone being hung up. On other occasions, music would be played over the telephone with lyrics such as "doctor my eyes" and "love train" and, certainly more disconcerting, "we'll be together forever or else" and "every step you take, every move you make, I'll be watching you." Eventually, the defendant admitted to Barbara Chubbuck, the victim's office coordinator, that she was making the telephone calls.

[3] The defendant later admitted that she sent these flowers to the victim.

[4] Merriam Webster's Collegiate Dictionary (10th Ed.) defines raspberry as "a sound of contempt made by protruding the tongue between the lips and expelling air forcibly to produce a vibration . . . ."

As a result, the victim terminated his physician-patient relationship with the defendant. The situation, however, intensified. The telephone calls to his office, characterized by the sound of a raspberry followed by a hang up, escalated, occurring almost daily. On one occasion, the victim took his wife and two children to a restaurant in Putnam. While there, one of the restaurant employees announced that there was an emergency telephone call from the hospital for the victim. When the victim picked up the telephone, he heard a raspberry followed by laughing and a hang up. The victim and his family immediately left the restaurant, and, as they did, the victim's wife observed the defendant's car departing from a donut shop across the street.

Similar telephone calls were made repeatedly to the victim's home telephone. When the victim's wife answered the telephone, she heard silence or a raspberry. The victim's wife sometimes received these telephone calls several times a week and at other times several times a day.

The defendant's harassment of the victim also occurred in writing. One night, the victim's wife observed the defendant following her to a health club known as the "Healthy Lady." A few days later, on Healthy Lady stationery, the victim's wife received an unsigned letter stating: "Debbie, I have wanted to tell you so many times at the fitness center that Richard is fooling around on you. I did not know how to say it but I felt that you should know. I feel that it is important due to the risk of HIV AIDS. I wish to remain anonymous because I don't want to lose my job over this. I hope that you can understand I'm only trying to help you. Often when he works late he has gone out with her. He turns his name light out and the two of them take off in her car. You deserve better. You're a great girl. Take care of yourself and those three children."

The victim also received a number of letters from the defendant. In one of the letters, signed by the defendant, she asked the victim to stop making the inference that the calls he was receiving in his office originated from her. In another letter, this one unsigned, the defendant warned the victim that his wife was watching the parking lot at the hospital to see if he was leaving with someone else. This letter further stated, "we think you're great and don't want to get you into any trouble at home so just be careful." In a third letter, the defendant again warned the victim that his wife was watching the parking lot of the hospital late at night. The defendant also sent a letter to Charles Schneider, the president of the hospital, alleging improper conduct on the part of the victim. A copy of this letter was also put in the mailboxes of at least two of the victim's neighbors. Finally, the defendant sent the victim a letter, stating in part, "Dr. Warner, I'm writing you a note of apology. I felt this was necessary in order to clear my conscience. First of all I am sorry for the flowers. I meant nothing other than kindness and appreciation. I chose not to sign my name and was going to let you know as soon as I saw you that they were from me. I didn't want anyone creating a problem over it."

During the trial, the victim described three incidents that occurred between June 10 and June 17, 1996, that formed the basis of the defendant's conviction for stalking in the third degree. The first incident occurred on June 10. Sometime between 6 p.m. and 7:30 p.m., after having completed his hospital duties, the victim left the hospital and went to his car. As he got near his vehicle, he noticed that the defendant was standing approximately sixty feet away, staring at him. The defendant stared at the victim as he quickly got into his vehicle and continued to stare at him as he drove by the hospital entrance and exited the parking lot. During the ride home, the victim stopped a number of times to make

sure that the defendant was not following him. The victim testified that as a result of that incident, he began to fear for his physical safety.

Four days later, on June 14, 1996, again between 6 p.m. and 7:30 p.m., the victim completed his hospital duties, exited the hospital through the physician's entrance and went to his car. While sitting in his car for a few moments, he observed in an adjacent parking lot near the main entrance to the hospital, a black Nissan vehicle that had backed into a parking space and appeared to be slowly pulling out. As this vehicle started to pull out, the victim observed that the two female occupants of the car were staring at him. When the occupants of the Nissan became aware that the victim was looking in their direction, however, they quickly turned their heads and backed into the same parking space. The victim became concerned and fearful. As he began to pull out of the parking lot, the Nissan quickly pulled out in front of his vehicle and stopped. At that point, the victim observed that it was the defendant who was driving the Nissan. The victim feared for his physical safety. As a result, the victim panicked and instead of following the defendant to the exit, he drove the wrong way through a one way entrance and sped away. Again, as he had done the previous evening, he stopped numerous times during the ride home to make sure that the defendant was not following him.

A third incident occurred three nights later, on June 17, 1996. The victim's five year old son took karate lessons at a fitness center on Main Street in downtown Putnam. The victim often went to the lessons to watch his son. The victim testified that "[m]any times while [he] was there, as [he] was either pulling into [the fitness center] or after, there were a number of incidents where the defendant would be there—parked either near [his] car or in that area, lying in wait—and would observe [him] or watch [him] or pull up to [him]." On this partic-

ular night, as they were leaving at approximately 7:15 p.m., the victim observed the defendant standing near the front desk. The victim stated that the defendant was "just staring at me and staring at my child." The victim grabbed his son and ran out of the building to his car. The victim observed that the defendant had also exited the building, was standing next to her car and continued to stare at him as he drove away.

In explaining how all these incidents had affected his life, the victim testified: "Well, it's affected my life in—well—my life tremendously. It's—you know—it's like living in prison. I mean, these things continue. The willfulness of it all. The continued lying-in-wait. Everywhere I go I—you know—there would be—I have incidents of phone calls, letters, letters to neighbors—I mean, it's just awful. I mean—none of it—I mean, I've done nothing wrong. Here I am as a doctor trying to help a patient and this is—you know—this is the—what occurred. And it is horrible. I live every day still in fear that something's going to happen to me. Fear that—you know—my children are going to be left alone if someday—you know—I'd drive up and meet her and she—or she's there and—ah'm—she does bodily harm to me. Ah'm—I mean, it's just awful. Nothing is changed. We still do the alarm, we still do the binoculars. At night—you know—you hear sounds and—normal sounds of the neighborhood and here I am running to the window—ah—trying to look out or going out and seeing—you know—what's occurring. It's just horrible. It's a horrible way to live in fear of your life. . . . [It's] a continued horrible experience in which every day I wake up I'm in fear of my safety."

## I

The defendant claims first that the trial court improperly failed to determine that §§ 53a-181d and 53a-181e are unconstitutionally vague and overbroad on their

face and as applied to her, in violation of her right to due process as set forth in both the federal and state constitution. We disagree.

Initially, we note that one attacking a validly enacted statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt, and on appeal this court will indulge in every presumption in favor of the statute's constitutionality. *State* v. *Jason B.*, 248 Conn. 543, 556, 729 A.2d 760 (1999). We note further that the only difference between §§ 53a-181d and 53a-181e is that the former section requires proof that the defendant *intentionally* caused the victim to fear for his safety, while the latter requires proof that the defendant *recklessly* caused such fear. All other elements of the two statutes are the same. The defendant makes no distinction between the two in her vagueness analysis.

A

This court has already considered, and rejected, the notion that § 53a-181d was facially void for vagueness. In *State* v. *Marsala*, 44 Conn. App. 84, 97, 688 A.2d 336, cert. denied, 240 Conn. 912, 690 A.2d 400 (1997), this court stated: "We adopt the holding and reasoning set forth in *State* v. *Culmo*, [43 Conn. Sup. 46, 67, 642 A.2d 90 (1993)]: [O]n consideration of [§ 53a-181d] in its entirety, it cannot be said that a person of common understanding would fail to understand what conduct is prohibited. Section 53a-181d is relatively narrow in scope. It applies only to those who act with the specific intention of causing others to fear for their physical safety. The fear for one's physical safety must be reasonable. The conduct must be undertaken wilfully, not mistakenly, and it must occur repeatedly. The statute on its face does not implicate speech or expression in any way; it criminalizes conduct only when undertaken with the requisite intent. The court concludes that any ambiguities in the statute's language are not so signifi-

cant as to render it void for vagueness." (Internal quotation marks omitted.) See also *State* v. *Cummings*, 46 Conn. App. 661, 668–69, 701 A.2d 663, cert. denied, 243 Conn. 940, 702 A.2d 645 (1997). Thus, as we have previously held, § 53a-181d is not unconstitutionally vague on its face.

The defendant's claim that § 53a-181e was impermissibly vague as applied to the facts in this case also fails.[5] To obtain a conviction for a violation of § 53a-181e, the state was required to prove, beyond a reasonable doubt, as follows: The defendant (1) recklessly (2) caused the victim to reasonably fear for his physical safety when the defendant (3) wilfully and (4) repeatedly (5) followed or lay in wait for the victim. Here, the defendant claims that the words "repeatedly" and "followed" are indefinite and imprecise and, therefore, the stalking statutes are unconstitutionally vague on their face.

In *State* v. *Marsala*, supra, 44 Conn. App. 98, we adopted the definition of "following" as elucidated in *State* v. *Culmo*, supra, 43 Conn. Sup. 63, wherein the court stated, "Webster's Ninth New Collegiate Dictionary defines 'follow' to mean 'to go, proceed, or come after' and 'pursue in an effort to overtake.' As used in § 53a-181d [and in § 53a-181e], which requires that any 'following' be 'wilful' 'and 'repeated,' the 'following' must have a predatory thrust to it. The statute does not encompass 'following' that is aimless, unintentional, accidental or undertaken for a lawful purpose. Of course, 'following' implies proximity in space as well as time. Whether someone has deliberately maintained sufficient visual or physical proximity with another person, uninterrupted, over a substantial enough period of time to constitute 'following' will depend upon a variety

---

[5] We agree with the state's position that this claim seems to be more in the nature of a sufficiency claim rather than a claim that the statute is vague as applied, but that the defendant, nonetheless, cannot prevail.

of differing factors in each case. These are appropriate issues for the trier of fact to decide . . . ."

There was evidence presented from which the jury could have found that the defendant followed the victim on three occasions between June 10 and June 17, 1996. Specifically, on June 10, 1996, the defendant went to the victim's place of employment, stood outside and, as the victim left work, stared continuously at him. On June 14, 1996, the defendant again went to the victim's place of employment, sat in a car in the parking lot, and, as the victim left work for home, she stared continuously at him and then pulled her car out in front of his and stopped the vehicle. On June 17, 1996, the defendant went to the fitness center, where the victim's son had a karate lesson, stood at the front desk as the victim was walking his son out to the car and stared at them, then went outside and continued to stare at them as they departed. Here, the state adduced evidence that the defendant maintained uninterrupted visual and physical proximity with the victim for substantial periods of time, and, accordingly, we conclude that the statute is not vague as applied to her. See *State* v. *Marsala*, supra, 44 Conn. App. 98.

Moreover, although this court in *Marsala* did not specifically adopt the definition of "repeatedly" set forth in *State* v. *Culmo,* supra, 43 Conn. Sup. 62, we do so now: "Webster's Ninth New Collegiate Dictionary defines 'repeatedly' as meaning 'again and again.' Acting 'repeatedly' in the context of the statute means precisely what the commonly approved usage of the word suggests—acting on more than one occasion. An isolated act of 'following' or 'lying in wait' cannot constitute 'stalking.' " Given the facts adduced at trial, it is clear that the defendant acted on more than one occasion.

Furthermore, the defendant has failed to make a persuasive case that in assessing a vagueness claim, a dif-

ferent analysis or contrary result is mandated under our state constitution from that of the federal constitution. For the purposes of a vagueness challenge, the due process clauses of both the state and federal constitutions have the same meaning and impose similar limitations. See *State* v. *Burke*, 51 Conn. App. 328, 334, 723 A.2d 327 (1998), cert. denied, 248 Conn. 901, 732 A.2d 177 (1999); *State* v. *Otero*, 49 Conn. App. 459, 470 n.12, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998). In *State* v. *Linares*, 232 Conn. 345, 377, 655 A.2d 737 (1995), our state Supreme Court expressly stated that "we have considered in detail the defendant's vagueness claims under the federal constitution, and she has failed to persuade us that our state constitution mandates a different analysis or contrary result." We likewise hold that the defendant's claim in this case must fail.

B

The defendant alleges further that §§ 53a-181d and 53a-181e are unconstitutionally overbroad. We have already rejected the claim as it relates to § 53a-181d and have concluded that our stalking statutes regulate conduct and not expression and do not implicate, on their face, recognized first amendment rights. See *State* v. *Marsala*, supra, 44 Conn. App. 97–98; *State* v. *Culmo*, supra, 43 Conn. Sup. 71–76; see also *Champagne* v. *Gintick*, 871 F. Sup. 1527, 1532–34 (D. Conn. 1994). We, furthermore, reject the defendant's claim as it relates to § 53a-181e for the same reasons elucidated in *Marsala* with regard to § 53a-181d. See *State* v. *Marsala*, supra, 97–98. The defendant's claim of overbroadness, therefore, also fails.

II

The defendant argues next that the trial court improperly failed to determine that the state presented insufficient evidence to support her conviction for a violation

of § 53a-181e. Specifically, the defendant claims that there was no evidence of repeated following or lying in wait, and, even if there was sufficient evidence of either of these elements, there was no evidence from which the jury could find that the victim had reasonable fear for his physical safety. There is no merit to this claim.

In analyzing a sufficiency of evidence claim, we first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, on the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. *State v. Jarrett*, 218 Conn. 766, 770–71, 591 A.2d 125 (1991); *State v. Weinberg*, 215 Conn. 231, 253, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). Applying the analysis mandated by those cases to the evidence presented to the jury, which evidence is recited in our discussion of the defendant's vagueness claims, we hold that the evidence presented to the jury fully supports its verdict that the defendant was guilty of stalking the victim. The defendant's claim is therefore without merit.

III

The defendant next claims that the trial court improperly gave a "Chip Smith" instruction to the jury, thereby violating her rights to due process as guaranteed by article first, § 8, of the constitution of Connecticut. There is no merit to this claim.

Since 1881, the instruction in various forms has been upheld as constitutional and proper when a jury announces that it is unable to reach a unanimous verdict. See *State v. Smith*, 49 Conn. 376 (1881). "It is

settled that a Chip Smith charge is an acceptable method of assisting the jury to achieve unanimity. [Id.]; see *State* v. *O'Neill*, 200 Conn. 268, 283, 511 A.2d 321 (1986); *State* v. *Avcollie*, 188 Conn. 626, 641, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Stankowski*, 184 Conn. 121, 147, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). The purpose of the instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence. 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8, p. 137. Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . . *State* v. *Ralls*, 167 Conn. 408, 424–25, 356 A.2d 147 (1974)." (Internal quotation marks omitted.) *State* v. *Wooten*, 227 Conn. 677, 707, 631 A.2d 271 (1993).

Our review of the "Chip Smith" instruction as a whole does not support the defendant's arguments that the instruction as given was imbalanced and lacked critical additional instructions. In *State* v. *Lyons*, 36 Conn. App. 177, 188, 649 A.2d 1046 (1994), we stated that the "Chip Smith" charge "in no way coerces dissenting jurors into subverting their opinions to those of the majority, but urges each juror to consider the questions before the jury with due regard and deference to the opinions of each other in an effort to arrive at a unanimous verdict. Although the charge does call on dissenting jurors to reevaluate their conclusions, such a charge is not coercive when considered in its totality." (Internal quotation marks omitted.) The instruction given here was that "each" juror give due regard to the opinion of other jurors. The charge in no way mandates that a juror

accept the position of the majority; rather, it asks only that the jurors listen to each other and examine their positions in light of the argument of others. We conclude, therefore, that the "Chip Smith" charge as given in this case was appropriate and proper and the defendant's claim that her due process rights were violated is, therefore, meritless.

## IV

The defendant claims next that the trial court improperly failed to instruct the jury adequately as to the element of the crime requiring that an individual "repeatedly" follow or lie in wait, in violation of the state and federal constitutions. We disagree and adopt the well reasoned definition of "repeatedly" stated by the court in *State* v. *Culmo*, supra, 43 Conn. Sup. 62–63, where it held, in its statutory construction of § 53a-181d, that "repeatedly" meant acting on more than one occasion. "Webster's Ninth New Collegiate Dictionary defines 'repeatedly' as meaning 'again and again.' Acting 'repeatedly' in the context of the statute means precisely what the commonly approved usage of the word suggests—acting on more than one occasion. An isolated act of 'following' or 'lying in wait' cannot constitute 'stalking.'" Id., 62. Therefore, to find that a defendant has violated §§ 53a-181d or 53a-181e, the jury must find, beyond a reasonable doubt, that the defendant followed the victim on more than one occasion, or lay in wait of the victim on more than one occasion or a combination of lying in wait and following the victim. The legislative purpose obviously was to prevent an accidental or coincidental occurrence from being denominated a crime. The required element of "repeatedly" is to distinguish behavior that is random or unintentional from behavior that is intentional and purposeful. In light of the facts adduced at trial, therefore, the defendant's claim is without merit and must fail.

## V

The defendant's final argument is that the trial court improperly failed to determine that the prosecutor committed prejudicial misconduct during final arguments, and that as a result of such misconduct, she was deprived of her due process right to a fair trial as guaranteed by article first, §§ 8, 9 and 19 of the constitution of Connecticut. Specifically, the defendant claims that the prosecutor's references during final arguments to (1) a telephone log that was not admitted into evidence, (2) the length of time it would take to drive from Chicopee, Massachusetts, where the defendant was a student, to Putnam, and (3) the fact that physical injury to the victim was not required under our stalking statutes, constituted misconduct.

"While it is possible for prosecutorial misconduct to occur in the course of closing argument . . . such alleged conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process in order to deprive the defendant of [her] constitutional right to a fair trial." (Citation omitted.) *State* v. *Santiago*, 45 Conn. App. 297, 302, 696 A.2d 344, cert. denied, 241 Conn. 927, 697 A.2d 362 (1997).

In closing argument to a jury, counsel must be allowed a generous latitude, since the limits of legitimate argument and fair comment cannot be determined precisely by rule and line and there must be some allowance for the zeal of counsel in closing argument. *State* v. *Richardson*, 214 Conn. 752, 760, 574 A.2d 182 (1990); *State* v. *Bowens*, 24 Conn. App. 642, 655, 591 A.2d 433, cert. denied, 220 Conn. 906, 593 A.2d 971 (1991). "The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) *State* v. *O'Brien*, 29 Conn. App. 724, 727–28, 618

A.2d 50 (1992), cert. denied, 225 Conn. 902, 621 A.2d 285 (1993).

Our review of the prosecutor's remarks indicate that such references by the prosecution were proper and within the parameters of the aforesaid applicable cases. There was no prosecutorial misconduct as alleged by the defendant and, as such, her claim is without merit.

The judgment is affirmed.

In this opinion the other judges concurred.