State of Connecticut *v.* Robert F. Culmo, Jr.

Superior Court        Geographical Area No. 9        File No. 122582
AT Middletown

Memorandum filed August 3, 1993

*John M. Cashmon,* assistant state's attorney, for the state.

*Breg & Breg,* for the defendant.

LAVINE, J. The defendant, Robert F. Culmo, Jr., who is charged with two counts of stalking in the second degree in violation of General Statutes § 53a-181d,[1] moved pursuant to Practice Book § 815 to dismiss this prosecution on the grounds that the statute defining the offense is unconstitutional. The defendant contends that this statute, enacted as part of Connecticut's prohibition against "stalking," violates his rights under the state[2] and federal constitutions because it is vague and overbroad on its face and invites abuse by police and prosecutorial agencies enforcing the law. The state responds that the issue is not ripe for review at this

---

[1] General Statues § 53a-181d (a), entitled "STALKING IN THE SECOND DEGREE: CLASS A MISDEMEANOR," provides: "A person is guilty of stalking in the second degree when, with intent to cause another person to fear for his physical safety, he wilfully and repeatedly follows or lies in wait for such other person and causes such other person to reasonably fear for his physical safety."

Stalking in the second degree is a class A misdemeanor, carrying possible maximum penalties of one year imprisonment, a fine of $2000, or both.

General Statutes § 53a-181c (a), entitled "STALKING IN THE FIRST DEGREE: CLASS D FELONY," provides: "A person is guilty of stalking in the first degree when he commits stalking in the second degree as provided in section 53a-181d and (1) he has previously been convicted of this section or section 53a-181d, or (2) such conduct violates a court order in effect at the time of the offense, or (3) the other person is under sixteen years of age."

Stalking in the first degree is not charged in the present case. It is a class D felony carrying possible maximum penalties of one to five years imprisonment, a $5000 fine, or both.

[2] Because the defendant has provided no separate analysis under the Connecticut constitution, the court will not analyze his claim that § 53a-181d violates the state constitution. See, e.g., *State* v. *Mercer,* 208 Conn. 52, 67 n.9, 544 A.2d 611 (1988).

stage of the proceedings and that the statute is neither vague nor overbroad.[3]

For the following reasons, the court finds that § 53a-181d, while not entirely free from ambiguity, is sufficiently definite to enable a person of common intelligence to know what conduct is prohibited. The motions to dismiss are denied because the defendant has failed to meet his significant burden of demonstrating that the statute is unconstitutional.

The defendant was arrested in December, 1992, on a warrant alleging that he had committed two counts of stalking in the second degree in violation of § 53a-181d. The affidavit in support of the arrest warrant application recited the following allegations: On November 16, 1992, the alleged victim complained to the Clinton police department that she had been followed by the defendant, her neighbor, while she had gone shopping on October 23 and October 25 of that year. The complaint stated that on October 23, the defendant had followed her while she was shopping at a local Stop & Shop. The complainant stated that the defendant left the store before her, and that when she went out to her car, she noticed the defendant sitting in his car two rows behind where she was parked, with the motor of his car running. The complainant stated that she put her groceries in her car and waited, and that the defendant drove around the parking lot and parked a

---

[3] The state argues that, in light of the limited record in this case, the defendant's motion should be denied as premature in light of the general rule that the constitutionality of a statutory provision attacked on void for vagueness grounds is determined by application of the provision to the facts at issue. As a consequence of the court's ruling considering the facial validity of § 53a-181d, the state's objection to a ruling at this time is rejected. Practice Book § 815 requires that claims that the law defining an offense is unconstitutional shall be made prior to trial if capable of determination without a trial of the general issue. Cf. *State* v. *Breton,* 212 Conn. 258, 562 A.2d 1060 (1989).

couple of spaces behind her. The complainant told the police that she then drove out of the shopping center parking area and headed home. The defendant followed very close behind her, almost running into her vehicle. The complainant evaded the defendant, however, and drove home.

On October 25, 1992, according to the complainant, she was shopping at another grocery store when she noticed the defendant following her in the aisles. She looked outside the store window and saw that the defendant's car was parked alongside her car.

The complainant stated that she feared that the defendant was going to do something to her. She stated also that the defendant drives or walks up and down her street, which is at the rear of his property. According to the affidavit, the complainant further stated that her husband had filed a complaint with the Connecticut state police alleging that the defendant had run him off the road. Based on these allegations, and others, issuance of an arrest warrant was authorized.

Following the granting of a portion of the defendant's motion for a bill of particulars dated January 29, 1993, seeking more information about the offenses alleged, the state, on Feburary 19, 1993, filed a substitute information, the present charging document, accusing the defendant of two counts of stalking in the second degree. Count one charged that "at the Town or City of Clinton, in the vicinity of 215 East Main Street on or about the 23rd day of October, 1992, the said Robert Culmo, Jr., at around 8 p.m., with intent to cause reasonable fear for the physical safety of another person, namely Kathleen Banks, while said Culmo was in a motor vehicle and on foot, did willfully and repeatedly follow and lie in wait for Kathleen Banks, in a manner likely to cause another person,

namely Kathleen Banks, to reasonably fear for her physical safety, all in violation of Section 53a-181d of the Connecticut General Statutes."

The second count charged that the state "further accuses Robert Culmo, Jr., of stalking and charges that at the Town of Clinton at 266 East Main St., on or about the 25th day of October, 1992, around 7:45 a.m., the said Robert Culmo, Jr., with intent to cause reasonable fear for the physical safety of another person, namely Kathleen Banks, while said Culmo was in a motor vehicle and on foot, did willfully and repeatedly follow and lie in wait for Kathleen Banks in a manner likely to cause another person, namely Kathleen Banks, to reasonably fear for her physical safety, all in violation of Section 53a-181d of the Connecticut General Statutes."

The substitute information contained allegations in both counts that the stalking allegedly occurred while the defendant "was in a motor vehicle and on foot," allegations not made in the first information filed.

In both motions to dismiss dated February 4, 1993, and April 8, 1993, and the supporting memoranda, the defendant asserted that the stalking statute violated the due process guarantees of the United States and Connecticut constitutions. The state filed a responsive memorandum on April 23, 1993, to which the defendant replied with another submission dated April 30, 1993. Oral argument was held on May 4, 1993. Following argument, the court requested that the defendant file another memorandum outlining with specificity what first amendment freedoms, or other fundamental constitutional guarantees, were claimed to be implicated by § 53a-181d. By a memorandum dated May 13, 1993, the defendant attempted to do so.

The defendant raises three closely related claims. The first is that § 53a-181d is so vague that the defendant cannot understand what conduct it prohibits. Asserting that the statute implicates fundamental constitutional guarantees, the defendant urges the court to consider the facial validity of the statute, not merely its vagueness as applied to him. Second, but closely related, the defendant argues that the statute is overly broad. The defendant claims that its language brings within its reach constitutionally protected conduct under the first amendment to the United States constitution—as well as the stalking conduct it seeks to make unlawful—and that it should therefore be declared unconstitutional as an encroachment on these protected activities. Third, the defendant contends that the statute's claimed lack of clarity invites abuse by police authorities and prosecutors who must implement it by granting them "unfettered discretion."

Prior to discussing the defendant's claims, a brief discussion of the legislative background of the stalking statute would be helpful. *DeFonce Construction Corp.* v. *State,* 198 Conn. 185, 187, 501 A.2d 745 (1985).

Spurred by problems that both celebrities and private citizens were having, California was the first state to pass a stalking law. In 1992, Connecticut's legislature followed suit, enacting General Statutes §§ 53a-181d and 53a-181c.[4]

---

[4] At least thirty states have enacted stalking statutes, using a wide variety of different formulations. Some statutes require that the stalking behavior be linked with a threat of physical harm. The statute passed by the legislature in California adopts such an approach. It provides in part that: "Any person who wilfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear of death or great bodily injury or to place that person in reasonable fear of death or great bodily injury of his or her immediate family is guilty of the crime of stalking . . . ." Cal. Penal Code § 646.9 (Deering 1993 Sup.)

Florida's legislature enacted a stalking statute that a Florida court recently struck down as unconstitutional. *State* v. *Kahles,* Fla. Cir. Ct., 17th

Testifying in favor of the stalking statute, Representative Thomas Luby, a principal sponsor, asserted that the proposed legislation "fills a gap" existing between the harassment statutes; General Statutes §§ 53a-182b and 53a-183; the breach of peace statute; General Statutes § 53a-181; and the threatening statute; General Statutes § 53a-62; because existing statutes "tend to require a more direct, a more explicit threat and a different kind of physical conduct and a higher level of fear." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1992 Sess., p.1287. Asserting that "many violent crimes are preceded by a period of stalking," Luby testified that the stalking law would provide the police with a "tool" to intervene in cases that fell into the gap. Existing statutes do not address "the situation where the criminal does not physically take an act against the person or does not verbally make a direct and immediate threat of harm," but merely stalks the victim, he argued. 35 H.R. Proc., Pt. 9, 1992 Sess., p. 2968. Representative James A. Amann, a supporter of the legislation, cited statistics from the Federal Bureau of Investigation that, he asserted, indicated that one out

Judicial District, Docket No. 92-022819 (March 8, 1993). Florida Statutes Annot. § 784.048 (2), (West 1993 Sup.), provided in relevant part that "[a]ny person who willfully, maliciously, and repeatedly follows or harasses another person commits the offense of stalking . . . ." The statute, which lacks a threat requirement, as well as the kind of specific intent requirement found in the Connecticut stalking law, and could, therefore, be applied to a newspaper reporter gathering news or a private detective investigating someone, was found by the court to be vague and overbroad.

The Massachusetts stalking law, Mass. Gen. L. ch. 265, § 43 (a) (West 1992) provides that "[w]hoever willfully, maliciously, and repeatedly follows or harasses another person and who makes a threat with the intent to place that person in imminent fear of death or serious bodily injury shall be guilty of the crime of stalking . . . ." This statute by its terms does not require that the threat be "credible" or that the fear be "reasonable." For a discussion of the constitutional problems raised by stalking statutes, see K. Thomas, "How to Stop the Stalker: State Antistalking Laws," 29 Crim. L. Bull. 224 (1993).

of every twenty adults will be a victim of stalking behavior and that a significant number of those persons will be victimized by crime. 35 H.R. Proc., Pt. 9, 1992 Sess., p. 2986. Luby stated that among the victims of stalking are children, people who do not know the stalker and spouses or former spouses of the stalker. 35 H.R. Proc., Pt. 9, 1992 Sess., p. 2967. A number of witnesses testified concerning their own or their childrens' experiences of being stalked. One witness described how her daughter had been followed by an unknown man before she was murdered. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 1992 Sess., pp. 1297–99. Witnesses testified to the intimidating impact of being stalked and its effect on their lives.

The first question to be answered is whether the defendant has standing to raise the claim that § 53a-181d is facially void due to vagueness. The court concludes that he does.

In determining whether the defendant has standing to attack § 53a-181d as void due to vagueness, the court is guided by well established principles.

When a defendant attacks a statute as being void due to vagueness, normally, a court limits its inquiry to the statute's impact as applied to the facts of the case before it. *State* v. *Perruccio,* 192 Conn. 154, 158, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984); *State* v. *Eason,* 192 Conn. 37, 46, 470 A.2d 688 (1984). This rule is intended to prevent courts from being put in the undesirable position of "considering every conceivable situation which might possibly arise in the application of complex legislation." *State* v. *Pickering,* 180 Conn. 54, 57, 428 A.2d 322 (1980).

When a challenged statute, however, if vague, could intrude on "fundamental constitutional guarantees," particularly first amendment freedoms, a facial anal-

ysis is undertaken because of the important nature of the rights involved. Id., 57–58 n.3; see also *State* v. *Proto,* 203 Conn. 682, 526 A.2d 1297 (1987); *State* v. *Cavallo,* 200 Conn. 664, 670, 513 A.2d 646 (1986). A statute that fails to delineate clearly the conduct being criminalized has a "chilling effect" on the exercise of first amendment liberties. *Grayned* v. *Rockford,* 408 U.S. 104, 108–109, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Thus, a defendant is permitted to challenge a statute's application to situations other than his own because such challenges will tend to vindicate the rights of others who might limit their lawful activities due to the statute's ambiguities. *State* v. *Williams,* 205 Conn. 456, 470 534 A.2d 230 (1987).

Typically, facial vagueness challenges have been entertained by courts confronting claims that a statute explicitly or implicitly affects recognized first amendment rights. See, e.g., *State* v. *Proto,* supra, 203 Conn. 696 (facial void for vagueness analysis applied to Connecticut Campaign Financing Act); *State* v. *Cavallo,* supra, 200 Conn. 664 (facial void for vagueness challenge to General Statutes § 53a-151, "Tampering with a witness" statute entertained); *State* v. *Leary,* 41 Conn. Sup. 525, 590 A.2d 494 (1989) (facial void for vagueness analysis applied to General Statutes § 53a-179a, "Inciting injury to persons or property: Class C felony"); see also *State* v. *Ball,* Superior Court, Judicial District of Litchfield, Docket No. 18-74479 (August 27, 1992), rev'd, 226 Conn. 265, 627 A.2d 892 (1993) (facial void for vagueness analysis applied to General Statutes § 53a-183a, the Hunter Harassment Act).

While the void for vagueness analysis is most commonly undertaken in the first amendment context, the language of *Pickering* and *Cavallo* make it clear that such analysis may also be appropriate when a challenged statute, if vague, could intrude on "fundamental constitutional guarantees" other than first amendment

rights. *State* v. *Pickering,* supra, 180 Conn. 57, states that vagueness analysis should be limited to the particular facts of a case unless the statute "intrudes on *fundamental constitutional guarantees.*" (Emphasis added.) *State* v. *Cavallo,* supra, 200 Conn. 670, states that the court will limit its inquiry to a statute's applicability to the facts of the case except when a statute "could intrude on *fundamental constitutional guarantees* such as first amendment rights . . . ." (Emphasis added.) In deciding whether the defendant has standing to mount a vagueness attack against § 53a-181d, the court must ask whether any first amendment freedoms or other fundamental constitutional guarantees are implicated by the statutes.

The defendant claims that the statute implicates numerous basic constitutional liberties and first amendment rights. Specifically, the defendant argues that § 53a-181d implicates: (1) the free exercise of religion, because it could deter individuals from proselytizing in a public place; (2) the rights of assembly and petition, because it could chill picketing and political demonstrations; and (3) freedom of the press, because it could have an impact on the news gathering activities of aggressive investigative reporters. The defendant also argues that the statute implicates "the right to travel and move about" in public places, citing for support *Lutz* v. *York,* 899 F.2d 255 (3d Cir. 1990).

The court agrees that, on its face, § 53a-181d implicates the fundamental right of intrastate travel, a right recognized in a different context by the Connecticut Supreme Court in *Bruno* v. *Civil Service Commission,* 192 Conn. 335, 347, 472 A.2d 328 (1984), and finds that the defendant, therefore, has standing to raise a facial void for vagueness challenge. See also *Lutz* v. *York,* supra, 899 F.2d 268.

By its title and its terms, the stalking statute implicates the right to move about freely in public. Webster's

Ninth New Collegiate Dictionary defines "stalk" as "to pursue quarry or prey stealthily." The statute prohibits repeated "following" and lying in wait with the requisite intent. The substitute information in the present case, in both counts, charges the defendant with repeatedly following the complainant while "in a motor vehicle" and "on foot." The affidavit in support of the arrest warrant makes it clear that the "following" alleged against the defendant all occurred in public places where the defendant would normally have a right to be: at a Stop & Shop, in the Stop & Shop parking lot, on the highway (first count), and at a Waldbaum's Foodmart (second count). Moreover, some of the conduct occurred in the context of the defendant's traveling to and from his own residence. The act of "following," in and of itself, can be quite neutral. One can follow someone coincidentally, or intentionally, but with benign intentions. In the present prosecution, where the defendant was traveling, why, and with what intention are all at issue. Whether the defendant had a lawful purpose to go where he did when he did is at the heart of the case. His right to move about freely in the community on public streets, in public places and in the vicinity of his home is clearly implicated by § 53a-181d.

The "right to travel" at issue in the present case is an outgrowth of earlier cases examining the right to travel abroad, and viewing the right as a "liberty" interest that is "basic in our scheme of values." *Kent* v. *Dulles,* 357 U.S. 116, 125–26, 78 S. Ct. 1113, 2 L. Ed. 2d 1204 (1958); see also *Aptheker* v. *Secretary of State,* 378 U.S. 500, 84 S. Ct. 1659, 12 L. Ed. 2d 992 (1964). In *Shapiro* v. *Thompson,* 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969), the United States Supreme Court struck down, on equal protection grounds, a minimum durational residency requirement for welfare benefits, finding it encumbered the "fun-

damental" right to travel between states. In 1971, faced with a challenge to a durational residency requirement imposed by the municipal housing authority of New Rochelle, New York, for admission to public housing, the United States Court of Appeals for the Second Circuit ruled that "[i]t would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *King* v. *New Rochelle Municipal Housing Authority,* 442 F.2d 646, 648 (2d Cir.), cert. denied, 404 U.S. 863, 92 S. Ct. 113, 30 L. Ed. 2d 107 (1971). The *King* court noted that the United States Supreme Court in *Shapiro* had refused to ascribe the source of the travel right to any particular constitutional provision, including the first amendment, relying instead on "our constitutional concepts of personal liberty . . . ." *Shapiro* v. *Thompson,* supra, 394 U.S. 629.

Approximately one year after *King,* in *Nicholls* v. *Schaffer,* 344 F.Sup. 238 (D. Conn. 1972), another equal protection challenge to a durational residency requirement that encumbered the right to vote, a federal district court implicitly recognized the right to intrastate travel.

Then in 1984, in *Bruno* v. *Civil Service Commission,* 192 Conn. 335, 472 A.2d 328 (1984), yet another case examining a durational residency requirement, the Connecticut Supreme Court explicitly recognized "a fundamental right to intrastate travel . . . ." Id., 347. The court did not state precisely what the source of this right was. See also *Kolender* v. *Lawson,* 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983), involving a vagueness challenge to an antiloitering statute, in which the United States Supreme Court made reference to "the constitutional right to freedom of movement" arguably implicated by the statute. Id., 358.

Perhaps the most detailed analysis of the right to intrastate travel, in the context of a criminal case, is contained in *Lutz* v. *York,* supra, 899 F.2d 255. In *Lutz,* the court considered an ordinance outlawing "cruising," which consisted of driving repeatedly around on certain public roads. The court concluded that what was at issue was "the right to travel locally through public spaces and roadways," finding that the right protected travel on foot and in an automobile. Id., 268. The court concluded that "the right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the nation's history,' " and found that a "fundamental right" was at issue. Id., 268–69. The court specifically declined to locate the right in the first amendment, finding that it was instead a due process right. Id., 267.

In light of *Bruno, Lutz,* and the other cases cited previously, the language of the statute, the legislative history, and the allegations as set out in the substitute information and affidavit in support of the arrest warrant, the court concludes that the defendant's right to intrastate travel is implicated in the present prosecution,[5] that the right is fundamental, and that he, therefore, has standing to raise a claim that § 53a-181d is facially void for vagueness.

In analyzing the statute to determine if it is void for vagueness, the court is guided by the fundamental precept that it is unfair to subject someone to prosecution if the law defining the offense fails to give adequate notice of what conduct is prohibited.

As stated by the United States Supreme Court in *Connally* v. *General Construction Co.,* 269 U.S. 385,

---

[5] Of course, this right to move freely about one's community, in the context of the criminal law, has significant limits, particularly when it collides with the rights of others.

391, 46 S. Ct. 126, 70 L. Ed. 322 (1926): "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

A vague law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis," if it does not clearly indicate what conduct is criminal and what is not. *Grayned* v. *Rockford,* supra, 408 U.S. 108–109; see also *State* v. *Schriver,* 207 Conn. 456, 459–60, 542 A.2d 686 (1988); *State* v. *Proto,* supra, 203 Conn. 695–96.[6] The requirement of definiteness applies "more strictly to penal laws than to statutes that exact civil penalties." *State* v. *Schriver,* supra, 460. Moreover, the accused is entitled to have a penal statute strictly construed in his favor. *State* v. *Whiteman,* 204 Conn. 98, 101, 526 A.2d 869 (1987).

Notwithstanding these accepted principles, a heavy presumption of constitutionality attaches to a law enacted by the legislature. As the Supreme Court has stated: "The party attacking a validly enacted statute, however, bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . In choosing between two constructions

---

[6] For a detailed analysis of void for vagueness cases, see A. Amsterdam, "The Void for Vagueness Doctrine in the Supreme Court," 109 Pa. L. Rev. 67 (1960); see also C. Burkholder, "Recent Supreme Court Developments of Vagueness Doctrine: Four Cases Involving the Vagueness Attack on Statutes During the 1972–73 Term," 7 Conn. L. Rev. 94 (1974).

of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989).

Because almost all language is inherently ambiguous to some degree,[7] "mathematical certainty" can never be obtained in the drafting of a statute. *Grayned* v. *Rockford*, supra, 408 U.S. 110; *State* v. *Proto*, supra, 203 Conn. 698. ("Ambiguity is, unfortunately, a common statutory ailment. . . . If the meaning of a statute can fairly be ascertained through judicial construction, however, it need not be stricken for vagueness.") Laws can be "general in nature" and still not be found to be vague if they provide sufficient certainty to give fair notice as to what conduct is prohibited. *State* v. *Chetcuti*, 173 Conn. 165, 167, 377 A.2d 263 (1977). "It is not necessary that a statute list the precise actions prohibited by it" to survive a vagueness attack. *State* v. *Eason*, supra, 192 Conn. 47; see also *State* v. *White*, 204 Conn. 410, 415–16, 528 A.2d 811 (1987).

Analysis of the language of § 53a-181d makes it clear that in order to obtain a conviction, the state must prove all of the following elements beyond a reasonable doubt: (1) that the perpetrator acted with intent to cause another person to fear for his or her physical safety; (2) that the perpetrator acted wilfully; (3) that the perpetrator acted repeatedly; (4) that the perpetrator followed *or* lay in wait for the other person; and (5) that the perpetrator caused the other person to reasonably fear for his or her physical safety.

---

[7] An in-depth discussion of certainty and ambiguity in statutory language can be found in an article by E. Freund, entitled "The Use of Indefinite Terms in Statutes," 30 Yale L. J. 437 (1921).

In undertaking analysis of these elements, the court is guided by General Statutes § 1-1, "Words and phrases," which provides that "[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." The court is guided as well by previous judicial opinions, the common law, dictionaries and treatises. *State* v. *Eason,* supra, 192 Conn. 46; *State* v. *Pickering,* supra, 180 Conn. 62–63.

Section 53a-181d requires that the accused act with the specific intention of causing another person to fear for his "physical safety." The term "physical safety" is not defined.[8] Webster's Ninth New Collegiate Dictionary defines "physical" as meaning "of or relating to the body," and "safety" as meaning "the condition of being safe from undergoing or causing hurt, injury, or loss." When the statute is construed as a whole; *Mitchell* v. *King,* 169 Conn. 140, 363 A.2d 68 (1975); it can be seen that the term "physical safety" is used in § 53a-181d in contradistinction to emotional or psychological safety. It requires a finding by the trier of fact that a person charged under the statute has acted with the intention of causing a victim to fear that he or she could be subjected to bodily harm in some way. The fact that the statute creates a specific intent requirement significantly vitiates any claim that its purported vagueness could mislead a person of common intelligence into misunderstanding what is prohibited. *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.,* 455

---

[8] General Statutes § 53a-3 (3) defines "physical injury" to mean "impairment of physical condition or pain," and § 53a-3 (4) defines "serious physical injury" to mean "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ."

U.S. 489, 491, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982); *State* v. *Cavallo,* supra, 200 Conn. 672.

The term "wilful" has a variety of shades of meaning depending on the context of its use, but it is not unduly vague as used in § 53a-181d. As the Supreme Court stated in *Rogers* v. *Doody,* 119 Conn. 532, 534, 178 A. 51 (1935), one acts wilfully when one performs an act in a manner that is "intentional, wrongful and without just cause or excuse" and with "an evil intent or guilty purpose to violate the law." See also *State* v. *Proto,* supra, 203 Conn. 703. Unless the actor has a bad purpose, wilfulness is not present. *Screws* v. *United States,* 325 U.S. 91, 101, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945).

Section 53a-181d requires that a perpetrator act "repeatedly" in stalking a victim before he or she can be charged. The defendant claims that the term "repeatedly" is ambiguous. The court does not agree.

Webster's Ninth New Collegiate Dictionary defines "repeatedly" as meaning "again and again." Acting "repeatedly" in the context of the statute means precisely what the commonly approved usage of the word suggests—acting on more than one occasion. An isolated act of "following" or "lying in wait" cannot constitute "stalking."

It is true that determining when a single course of continuous conduct has devolved into "repeated" conduct may not always be simple. For example, if an individual follows another person to the local drug store, waits outside while the person goes in, and then resumes following the person, has only one act of following occurred, or is the following "repeated"? The statute does not attempt to place boundaries of time, or space, around the proscribed repetitive conduct. In leaving these parameters undefined, however, § 53a-181d is no different from many statutes that leave

equally vexing questions unaddressed. The question of whether a defendant has been "repeatedly" following or lying in wait for a victim is a question best reserved for the deliberations of the trier of fact, considering all of the evidence in the case.

A wilful and repeated "following" or "lying in wait" is required to constitute a violation of the statute. Webster's Ninth New Collegiate Dictionary defines "follow" to mean "to go, proceed, or come after" and "pursue in an effort to overtake." As used in § 53a-181d, which requires that any "following" be "wilful" and "repeated," the "following" must have a predatory thrust to it. The statute does not encompass "following" that is aimless, unintentional, accidental or undertaken for a lawful purpose. Of course, "following" implies proximity in space as well as time. Whether someone has deliberately maintained sufficient visual or physical proximity with another person, uninterrupted, over a substantial enough period of time to constitute "following" will depend upon a variety of differing factors in each case. These are appropriate issues for the trier of fact to decide, not this court.

Language has its limits. Such ambiguities as exist in the use of the word "follows" are not sufficient to render its meaning incomprehensible to a person of common intelligence.

The statute can also be violated by repeatedly "lying in wait." "Lying in wait" is an ancient phrase with a widely understood meaning in the context of various statutes defining first degree murder. Black's Law Dictionary (6th Ed. 1990) defines "lying in wait" to mean "[l]ying in ambush; lying hidden or concealed for the purpose of making a sudden and unexpected attack upon a person when he shall arrive at the scene." See also annot., 89 A.L.R.2d 1142 (1963). " 'Lying in wait' as a legal concept has physical and mental elements.

Those generally stated are the physical ones of waiting, watching, and secrecy or concealment, and the mental one of purpose or intent to inflict bodily injury or to kill another unawares." Id.

The phrase "lying in wait" is no stranger to Connecticut law. Prior to repeal, Connecticut's homicide statute, General Statutes § 53-9, had for decades defined murder in the first degree to include all murder "perpetrated by . . . lying in wait . . . ."

The term has repeatedly been examined by courts throughout the country, particularly by courts construing California's homicide statute, which states that murder perpetrated by "lying in wait" is murder of the first degree. Cal. Penal Code § 189 (Deering 1985). Review of the cases makes it clear that "lying in wait" consists of three elements: watching, waiting and concealment. *People* v. *Tuthill,* 31 Cal. 2d 92, 101, 187 P.2d 16 (1947), cert. denied, 335 U.S. 846, 69 S. Ct. 56, 93 L. Ed. 396 (1948); accord *People* v. *Byrd,* 42 Cal. 2d 200, 212–13, 266 P.2d 505, cert, denied, 348 U.S. 848, 75 S. Ct. 73, 99 L. Ed. 668 (1954).

It is noteworthy that Connecticut's criminal attempt statute, General Statutes § 53a-49 (b) (1), also makes reference to "lying in wait" and "following." The attempt statute provides in relevant part that "[l]ying in wait, searching for or following the contemplated victim of the crime" shall not be held insufficient as a matter of law to constitute a substantial step toward commission of a crime if strongly corroborative of the actor's criminal purpose. In using the terms "following" and "lying in wait" in succession in § 53a-181d, the legislature was using well accepted legal terminology. For purposes of § 53a-181d, the term "lying in wait" is not vague.

The defendant argues that § 53a-181d is vague because in requiring that the victim's fear of harm be

reasonable, it is not clear if an objective or subjective standard is involved. Referring to *State* v. *DeJesus,* 194 Conn. 376, 481 A.2d 1277 (1984), concerning the use of self-defense where one has a "reasonable belief" it is necessary, the defendant claims that the possible use of a subjective standard will subject innocent defendants to extreme allegations made by hypersensitive victims. *DeJesus* makes it clear, however, that in the context of self-defense, the test for the degree of force permitted is "both subjective and objective." Id., 389 n.13. "The jury must view the situation from the perspective of the defendant. . . . [H]owever . . . the defendant's belief ultimately must be found to be reasonable." Id.; see also *State* v. *Shaw,* 185 Conn. 372, 376–77, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982). There is no reason to conclude that the standard to be applied in the context of stalking victims would be signficantly different from the subjective-objective standard used in the context of self-defense cases such as *DeJesus.* See also *State* v. *Raguseo,* 225 Conn. 114, 126–28, 622 A.2d 519 (1993).

The legislature's decision to focus on the fear created in the victim is not unlike the approach adopted in the kidnapping in the first degree statute, General Statutes § 53a-92 (a) (2) (c), which requires a determination as to whether a defendant acted with the intent to "terrorize" a third person; the breach of peace statute, General Statutes § 53a-181, which prohibits certain actions when undertaken with "intent to cause inconvenience, annoyance or alarm"; and the harrassment in the first degree statute, General Statutes § 53a-182b, which makes certain acts illegal if undertaken "with the intent to harass, annoy, alarm or terrorize" another person. Those statutes all require the trier of fact to evaluate the extent to which a defendant's conduct was under-

taken with the intention of causing a victim's peace of mind and sense of well-being to be disturbed.

Nor is there anything unusual in the legislature's decision to require that the trier of fact evaluate whether a victim's fear for his or her physical safety is "reasonable." Connecticut's penal code contains numerous statutes that require analysis of whether an actor's beliefs are reasonable. See, e.g., General Statutes § 53a-18, "Use of reasonable physical force or deadly physical force generally," which links the use of physical force or deadly physical force to the reasonableness of the belief that it is justified; General Statutes § 53a-19, "Use of physical force in defense of person," which permits the use of "reasonable physical force" when an actor "reasonably believes" such force is necessary in the face of the use or imminent use of physical force by an aggressor; General Statutes § 53a-20, "Use of physical force in defense of premises," which permits a person to use "reasonable physical force" in defense of his premises, in defined circumstances, when he "reasonably believes" it is necessary; and General Statutes § 53a-22, "Use of physical force in making arrest or preventing escape," which defines a "reasonable belief" that a person has committed a crime as being "a reasonable belief in facts or circumstances which if true would in law constitute an offense." See also General Statutes § 53a-70, "Sexual assault in the first degree: Class B felony: One year not suspendable," which provides: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such person or against a third person which *reasonably causes such person to fear physical injury to such person or a third person* . . . ." (emphasis added); cf. *State v. Smith,* 210 Conn. 132, 144, 554 A.2d 713 (1989)

(General Statutes § 53a-70 not void for vagueness since "it is clear that a defendant must either use force or threaten its use by words or conduct that would reasonably generate fear of physical injury").

In the court's view, on consideration of the statute in its entirety, it cannot be said that a person of common understanding would fail to understand what conduct is prohibited. Section 53a-181d is relatively narrow in scope. It applies only to those who act with the specific intention of causing others to fear for their physical safety. The fear for one's physical safety must be reasonable. The conduct must be undertaken wilfully, not mistakenly, and it must occur repeatedly. The statute on its face does not implicate speech or expression in any way;[9] it criminalizes conduct only when undertaken with the requisite intent. The court concludes that any ambiguities in the statute's language are not so significant as to render it void for vagueness. *State* v. *Proto,* supra, 203 Conn. 708.

The question arises as to what standard of review the court should apply in determining if the asserted state interest is weighty enough to justify the infringement on the right to move about freely, which § 53a-181d implicates.[10] The approach taken by the

[9] The word "harass," which could be construed to include speech or expressive conduct within its reach, was removed from an early version of the statute. According to Representative Thomas Luby, a harassment statute already exists, and the use of the word "harassment" might have created confusion. 35 H.R. Proc., Pt. 9, 1992 Sess., p. 2978.

[10] In the context of the first amendment, the court has developed a wide variety of formulations in determining whether governmental infringements on protected rights can be justified, depending on the nature of the interest involved. "Pure speech" can be limited only where there is a "clear and present danger" involved. *Cantwell* v. *Connecticut,* 310 U.S. 296, 308, 60 S. Ct. 900, 84 L. Ed. 1213 (1940). Restrictions on "symbolic speech" can be countenanced only if limiting it is within the constitutional power of the government, if the limitation furthers an important or substantial

Court of Appeals for the Third Circuit in *Lutz* v. *York,*
supra, 899 F.2d 255, is instructive. In *Lutz,* the court
found that the traffic ordinance in question burdened
the right of an individual to move about freely in one's
community. In determining what standard of review
to apply to the ordinance, the court rejected the appel-
lant's argument that the statute in question could be
upheld only if it promoted a "compelling" state inter-
est. Id., 268–69. The court ruled that applying strict
scrutiny to the travel interest there involved would be
"just as inappropriate as applying no heightened scru-
tiny," and opted to apply the intermediate scrutiny
standard used in cases involving the regulation of

government interest, if the interest in regulation is unrelated to the sup-
pression of free expression, and if the incidental restrictions on alleged first
amendment freedoms is no greater than is essential to the furtherance of
the governmental interest. *United States* v. *O'Brien,* 391 U.S. 367, 376–77,
88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).

In regulating expressive conduct in a traditional public forum, the govern-
ment may impose content-neutral time, place and manner restrictions if
they are narrowly tailored to serve "significant" government interests.
*Clark* v. *Community for Creative Nonviolence,* 468 U.S. 288, 293–94, 104
S. Ct. 3065, 82 L. Ed. 2d 221 (1984). As noted in *Lutz* v. *York,* supra, 899
F.2d 269, "the tailoring requirement" in the context of public forum time,
place and manner cases does not require the state to employ the least restric-
tive means of achieving its objective, as is required under approaches requir-
ing "full-blown strict scrutiny." In regulating expressive conduct in a
nonpublic forum, only a "reasonable state interest" must be demonstrated
to justify a state restriction. See also *International Society for Krishna Con-
sciousness, Inc.,* v. *Lee,* 505 U.S. 672, 112 S. Ct. 2701, 120 L. Ed. 2d 541
(1992); *Perry Education Assn.* v. *Perry Local Educators' Assn.,* 460 U.S.
37, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). A variety of other ad hoc balanc-
ing tests has been used depending on the first amendment interests involved.
In contexts not involving the first amendment, a variety of formulations
has been used, some requiring "strict scrutiny," where a fundamental right
is involved. See, e.g., *Roe* v. *Wade,* 410 U.S. 113, 155, 93 S. Ct. 705, 35
L. Ed. 2d 147 (1973); *Shapiro* v. *Thompson,* 394 U.S. 618, 638, 89 S. Ct.
1322, 22 L. Ed. 2d 600 (1969). In the court's view, "strict scrutiny" is inap-
propriate in the present criminal prosecution because the qualified right
to intrastate travel at issue does not rise to the level of the sort of political
free speech right deserving of full-blown protection.

speech in traditional public fora. The *Lutz* court said that the concerns underlying York's cruising ordinance were "highly analogous" to the concerns underlying the time, place and manner approach. Under that approach, a state may impose content-neutral time, place and manner restrictions if they are "narrowly tailored to serve significant government interests—not necessarily compelling ones—while leaving open ample alternative channels of communication." Id., 269.

The Connecticut Supreme Court, in *State* v. *Proto*, supra, 203 Conn. 692, held that to justify infringing on the right to make campaign contributions, the state must demonstrate " 'a sufficiently important interest and employ . . . means closely drawn to avoid unnecessary abridgement of associational freedoms,' " quoting *Buckley* v. *Valeo*, 424 U.S. 1, 25, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). Recently, that court considered what level of state justification was required to uphold the reenacted Hunter Harassment Act, General Statutes § 53a-183a. *State* v. *Ball*, supra, 226 Conn. 277–78.

The analytical framework spawned by the first amendment cases was not designed for a case such as the present one, where a right to move about freely, not rooted in the first amendment, is at issue. The first amendment framework, however, is sufficiently analogous to provide a general approach to analysis.

In the court's view, whether the approach used in *Lutz* v. *York*, supra, 899 F.2d 255, or the formulation put forth in *State* v. *Proto*, supra, 203 Conn. 682, or another similar formulation is adopted, § 53a-181d passes muster because the state's interest in criminalizing stalking behavior is sufficiently important: indeed, it is compelling. It is compelling in protecting citizens from the immediate consequences of stalking behavior. It is compelling in providing law enforcement authorities with a means for intervening in stalking situations

early on, before the behavior can escalate into something more serious, including physical assault. And it is compelling in safeguarding the mental well-being of victims. Providing protection from stalking conduct is at the heart of the state's social contract with its citizens, who should be able to go about their daily business free of the concern that they may be the targets of systematic surveillance by predators who wish them ill. The freedom to go about one's daily business is hollow, indeed, if one's peace of mind is being destroyed, and safety endangered, by the threatening presence of an unwanted pursuer.

The right to move about freely, implicated by § 53a-181d, is of necessity a qualified right, restricted by numerous factors, including the need to protect the safety and public order of the community; *Heffron* v. *International Society for Krishna Consciousness*, 452 U.S. 640, 650, 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981); the right to control the flow of traffic and manner in which motor vehicles are operated, *Lutz* v. *York*, supra, 899 F.2d 255; and the need to recognize and respect the privacy and property rights of others. See T. Emerson, The System of Freedom of Expression, "Maintaining the Public Peace," pp. 311–45; see also, e.g., General Statutes § 53a-182a, "Obstructing free passage." As the United States Supreme Court noted in *Public Utilities Commission* v. *Pollack*, 343 U.S. 451, 465, 72 S. Ct. 813, 96 L. Ed. 1068 (1952): "The liberty of each individual in a public vehicle or public place is subject to reasonable limitations in relation to the rights of others." See also *State* v. *Nelson*, 126 Conn. 412, 424, 11 A.2d 856 (1940).

In summary, by providing for protection of the victim, maximizing the opportunity for prevention of more serious crime, and providing a tool for intervention by police authorities, § 53a-181d serves numerous interrelated compelling interests. By including a specific

intent requirement, the requirement that the victim's fear be "reasonable," and the requirement that the conduct be "repeated" and "wilful," the statute is narrowly drawn to avoid infringement on protected rights. *State* v. *Cavallo,* supra, 200 Conn. 664; cf *Gormley* v. *Director, Connecticut State Department of Probation,* 632 F.2d 938, 941 (2d Cir. 1980) (Connecticut's telephone harassment statute, General Statutes § 53a-183 [a] [3], justified by a "compelling" interest in the protection of "innocent individuals from fear, abuse or annoyance" at the hands of persons who misuse the phone).

The defendant also attacks § 53a-181d as facially overbroad. He asserts that the statute brings within its reach activities such as news gathering, religious proselytizing and picketing, which are protected by the first amendment. He makes no claim that he himself was engaging in these activities, and, therefore, makes no claim that the statute is overbroad as applied to him.

Before addressing these concerns, the court must determine if the defendant has standing to raise the claim that the statute is overbroad on its face. The court concludes that he does not.

As the Supreme Court noted in *State* v. *Proto,* supra, 203 Conn. 706, because the vagueness and overbreadth doctrines are so closely related, they are "[s]ometimes . . . functionally indistinguishable." Note, "The First Amendment Overbreadth Doctrine," 83 Harv. L. Rev. 844, 845 n.5 (1970). In fact, as one commentator has noted, vagueness and overbreadth are conceptually distinct, because "an overbroad law need lack neither clarity nor precision, and a vague law need not reach activity protected by the first amendment." L. Tribe, American Constitutional Law, (1978) p. 718. Unlike vagueness analysis, the overbreadth doctrine operates only in the sphere of the first amendment. *Schall* v.

*Martin,* 467 U.S. 253, 269 n.18, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984); *State* v. *Ayala,* 222 Conn. 331, 344 n.12, 610 A.2d 1162 (1992).

The normal rules of standing are relaxed in the first amendment area because of the exalted status of the first amendment and the high value society places on protecting free expression. As explained by the United States Supreme Court in *Broadrick* v. *Oklahoma,* 413 U.S. 601, 611–12, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973): "It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. . . . As a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendment area—'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' *Dombrowski* v. *Pfister,* 380 U.S. 479, 486, 85 S. Ct. 1116, 14 L. Ed. 2d 22 (1965). Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."

In *State* v. *Proto,* supra, 203 Conn. 707, the Connecticut Supreme Court adopted the standing formulation set out in *Members of the City Coucil of Los Angeles* v. *Taxpayers for Vincent,* 466 U.S. 789, 801, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984), where the court held that a party has standing to raise an overbreadth claim only if there is a "realistic danger that the statute itself will significantly compromise recognized First Amend-

ment protections of parties not before the Court
. . . ." See also *Husti* v. *Zuckerman Property Enter-
prises, Inc.,* 199 Conn. 575, 587, 508 A.2d 735 (1986);
*State* v. *Rivera,* 30 Conn. App. 224, 230, 619 A.2d 1146
(1993).

The task of demonstrating that a statute will signifi-
cantly compromise recognized first amendment rights
of parties not before the court, thus triggering facial
overbreadth analysis, is on the defendant. As the
United States Supreme Court stated in *Clark* v. *Com-
munity for Creative Nonviolence,* 468 U.S. 288, 293 n.5,
104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984), the defend-
ant must bear the burden of demonstrating that the
first amendment even applies because to hold other-
wise "would be to create a rule that all conduct is
presumptively expressive."

In undertaking this threshold analysis, courts have
relied heavily on the distinction between statutes that
regulate conduct and statutes that regulate expres-
sion.[11] The Supreme Court has held that when a stat-
ute proscribes intentional conduct, not speech, the first
amendment is not implicated; *State* v. *Williams,* supra,
205 Conn. 474; because conduct is subject to regula-
tion for the protection of society. *Cantwell* v. *Connect-
icut,* 310 U.S. 296, 304, 60 S. Ct. 900, 84 L. Ed. 1213
(1940). A review of Connecticut decisions in which over-

---

[11] Providing different protections for "speech" as opposed to "action"
was a central tenet of the system of freedom of expression championed
by Thomas Emerson. According to Professor Emerson: "The central idea
of a system of freedom of expression is that a fundamental distinction must
be drawn between conduct which consists of 'expression' and conduct which
consists of 'action.' 'Expression' must be freely allowed and encouraged.
'Action' can be controlled, subject to other constitutional requirements, but
not by controlling expression. A system of freedom of expression cannot
exist effectively on any other foundation, and a decision to maintain such
a system necessarily implies acceptance of this proposition." T. Emerson,
The System of Freedom of Expression, "Maintaining the Public Peace,"
p. 17.

breadth analysis was undertaken indicates that our courts carefully adhere to the approach that overbreadth analysis should be undertaken only in cases in which the words of the statute clearly implicate expressive activity. See, e.g., *State* v. *Williams,* supra (General Statutes § 53a-167a, "Interfering with an officer," encompasses verbal conduct because the word "resists" is used in the statute); *State* v. *Rivera,* supra, 30 Conn. App. 224 (General Statutes § 53a-179b [a], "Rioting at correctional insitution," merits overbreadth analysis in light of the statute's use of the words "incites," "instigates" and "organizes"); *State* v. *Leary,* supra, 41 Conn. Sup. 525 (General Statutes § 53a-179a, "Inciting injury to persons or property," merits overbreadth analysis in light of statute's making it a crime when a person "orally, in writing, in printing" or in any other manner "advocates, encourages, justifies, praises, incites, or solicits" certain actions); see also *Dorman* v. *Satti,* 678 F. Sup. 375, 382–83 (D. Conn. 1988), cert. denied, 490 U.S. 1099, 109 S. Ct. 2450, 64 L. Ed. 2d 1005 (1989) (use in previous version of Connecticut's Hunter Harassment Act, § 53a-183 [a], of the term "harass," viewed in light of legislative history, found clearly to encompass communication).

In light of the clear teaching of the case law and the language of § 53a-181d, the court concludes that the defendant has not met his burden of demonstrating that he has standing to challenge the statute on overbreadth grounds.

Section 53a-181d can be violated without a defendant's uttering a syllable, writing a word, or making a gesture. In the present case, the charging document and affidavit in support of the arrest warrant contain no allegations that words, gestures, writings, or expressive conduct were part of defendant's alleged activities. As noted, the word "harass" does not appear in the statute, having been removed from an earlier draft.

Neither does the word "annoy" or "interfere" appear, or any other term that could reasonably be construed to include verbal as well as physical conduct. Just as "a physical assault is not by any stretch of the imagination, expressive conduct protected by the First Amendment"; *Wisconsin* v. *Mitchell,* 508 U.S. 476, 484, 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993); neither is "stalking" behavior.

It is of course predictable that in the course of prosecuting cases, the state will introduce evidence of words spoken, writings delivered, or gestures made to prove that a defendant acted with the requisite intent. This is likely to be particularly true in cases involving defendants who have had previous relationships with their victims, e.g., former spouses, former girlfriends, former boyfriends and the like.

Words can be used to prove an intention to violate virtually any penal statute, however, and their use as evidence of crime does not transform a statute criminalizing conduct into a statute implicating protected communication. As the Supreme Court of Oregon pointed out in the context of that state's "hate crimes" statute, there is a distinction between "making speech the crime itself, or an element of the crime, and using speech to prove the crime. . . ." *State* v. *Plowman,* 314 Or. 157, 167, 838 P.2d 558 (1992). Further, as the United States Supreme Court ruled recently in upholding a Wisconsin statute creating enhanced penalties for those convicted of "hate crimes," "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin* v. *Mitchell,* supra, 508 U.S. 489.

The defendant, therefore, lacks standing to pursue a facial challenge because § 53a-181d does not, on its face, implicate recognized first amendment rights.[12]

---

[12] As noted, the intrastate travel right discussed in connection with the court's vagueness analysis has not been found to be rooted in the first

The defendant argues that § 53a-181d gives "unfettered" discretion to police authorities and prosecutors due to its alleged imprecision.

All criminal statutes require police authorities, and prosecutors, to exercise discretion in deciding when they should be applied, and when they should not. As noted, the statute is relatively narrow in scope and sufficiently explicit to provide guidance as to its proper use. Invoking § 53a-181d against persons engaging in protected speech—such as picketing, news gathering, or proselytizing—would of course be a serious abuse of the statute, unless these activities were being used to camouflage unlawful stalking behavior. While § 53a-181d will require judicious use, the court rejects the claim that it vests unfettered discretion in police authorities and prosecutors.

The defendant has failed to bear his significant burden of demonstrating that § 53a-181d is vague on its face. He lacks standing to mount a facial challenge based on overbreadth. While implicating the right to move about freely, the statute is clearly justified by the state's compelling interest in criminalizing stalking behavior.

For these reasons, and those previously stated, the defendant's motions to dismiss are denied.

---

amendment. See *Lutz* v. *York,* supra, 899 F.2d 255, and *Bruno* v. *Civil Service Commission,* supra, 192 Conn. 335.